## BOISE v. TALCOTT.

(District Court, S. D. New York. April 8, 1914.)

1. FACTORS (§ 47*)—LIEN—POSSESSION.

The validity of a factor's lien is determined by the factor's actual or constructive possession of the property.

[Ed. Note.—For other cases, see Factors, Cent. Dig. §§ 65–71; Dec. Dig. § 47.*]

2. BANKRUPTCY (§ 188*)—FACTOR'S AGREEMENT—VALIDITY—LIEN.

Where a factor's agreement provided that, in consideration of certain advances made and to be made by defendant, he was given possession of the bankrupts' goods, accounts receivable, etc., was to have the whole future management of the business so long as the arrangement continued, and a percentage on sales, and immediately on taking possession he gave wide publicity to the same, informing commercial agencies, creditors, etc., placing signs about the premises conspicuously bearing his name as factor for the corporation, the contract was valid, and afforded him a lien for his advancements not only as against the goods then in possession of the bankrupts, but on those subsequently purchased.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 286–289, 291–295; Dec. Dig. § 188.*]

3. BANKRUPTCY (§ 279*)—FACTOR'S AGREEMENT—ACCOUNTING.

Where a factor's agreement gave defendant entire possession and charge of the business of a corporation, together with a lien for advances on accounts receivable, stock, etc., the corporation's trustee in bankruptcy was entitled to an accounting from defendant for all the merchandise consigned to him, or its value, for the accounts collected for goods sold, and for the loans and advances made and to be made during the continuance of the agreement.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 419–424; Dec. Dig. § 279.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Action by Edward B. Boise, as trustee in bankruptcy of the estate of Daly & Schaefer, Incorporated, against James Talcott. Judgment for defendant.

Fried & Czaki, of New York City, for complainant.

James, Schell & Elkus, of New York City (Abram I. Elkus and Wesley S. Sawyer, both of New York City, of counsel), for defendant.

HAZEL, District Judge. This is an action by the trustee in bankruptcy of Daly & Schaefer, Incorporated, to recover the value of merchandise, consisting of laces, embroideries, and silks, alleged in the bill to be owned by the bankrupt estate, and claimed by the defendant, who was engaged as a commission merchant, and who also acted as factor and banker in the dry goods trade, to have come into his possession under a factor's agreement dated December 28, 1908, by which he agreed to finance Daly & Schaefer, Incorporated, to 40 per cent. of the cost value of the stock contained in its place of business, and to 75 per cent. of the net value of the accounts receivable, in return for which he was to receive a commission. It is shown that pursuant to said agreement Daly & Schaefer consigned to the defendant the stock on hand and the accounts receivable, and that the defendant immediately entered upon the premises of the bankrupt, took possession of the merchandise, procured the lease of the premises to be assigned to him, paid the rent, put up signs in various places on the premises to indicate his factorship, and at the same time advanced $50,000 to pay for merchandise delivered, and subsequently made large advances. A sign conspicuously bearing the words, "James Talcott, Factor for Daly & Schaefer, Inc.," was placed at the entrance to the building occupied by the bankrupt company, while other signs similarly worded were placed on the doors and transom leading to the loft occupied by it; and in the office at a desk occupied by the representative of the defendant was a sign bearing the name James Talcott, which could be seen by those entering and approaching the desk.

Upon taking possession of the premises under the factor's agreement the defendant immediately notified the Dun, Bradstreet, and Woods commercial agencies to insert notices thereof in their subsequently issued reports to the trade, and it appears that said commercial agencies afterwards gave out information to inquirers apprising them of the fact that the defendant had agreed to finance Daly & Schaefer, and was its factor.

It appears that just before making the factor's agreement in question the bankrupt was financed by the firm of Salen & Schroder, petitioning creditors in the bankruptcy proceeding, doing business in New York and Paris, and that it was indebted to them in the sum of $38,000, which indebtedness by agreement in writing became subordinated to the lien of the defendant. The material provisions of the factor's agreement are:

"1st. Daly & Schaefer hereby constitute and appoint James Talcott their sole factor and selling agent, and hereby agree to consign to him for sale upon commission the entire stock of goods now owned or held by them, and

all goods which at any time hereafter, during the continuance of this agreement, they may purchase, manufacture or receive for sale. All sales of said goods shall be made by James Talcott; the goods shall be invoiced in the name of 'James Talcott, Factor for Daly & Schaefer'; and all accounts shall be payable to James Talcott.

"2nd. Daly & Schaefer hereby agree to sell, assign and transfer to James Talcott all the outstanding accounts now owned by them and shall notify their customers of such assignment.

"3rd. All books used in the business of said department shall be the property of James Talcott, who shall have supervision of all accounts. James Talcott shall also supervise all credits and keep the accounts of said business at his main store, 108 Franklin street, New York City, and shall attend to the collection of accounts and all necessary details in connection therewith at his own expense; and James Talcott further agrees to pay the rent of premises selected by him in which said business is to be conducted.

"4th. Daly & Schaefer agree to pay all other expenses which shall be incurred in the said business including salaries of salesmen and other employés, except as aforesaid, stationery, postage, telegrams, all office, selling, packing, cartage, storage, and incidental expenses, and premiums for insurance. All insurance shall be in the name of James Talcott.

"5th. James Talcott shall have exclusive supervision and control of all of said consigned goods and shall decide all questions as to the credit to be given to purchasers, and all correspondence, books, accounts, remittances, checks, bills receivable and proceeds of sale, as well as the said goods, shall be in the exclusive possession and control of James Talcott as factor aforesaid.

"6th. James Talcott hereby agrees to loan on demand in check or acceptance to Daly & Schaefer an amount which shall not exceed forty (40%) per cent. of the net cost of the goods then in his possession, it being understood that during the months of March and September the amount of goods so advanced upon will not exceed eighty-five thousand ($85,000) dollars and during the remaining ten months of the year it shall not exceed sixty thousand ($60,000) dollars. If the merchandise on hand shall depreciate in value the amount of said depreciation shall be deducted from time to time the amount to be loaned to Daly & Schaefer as aforesaid.

"7th. James Talcott further agrees to loan on demand in check or acceptance to Daly & Schaefer an amount equal to seventy-five (75%) per cent. of the net value of the outstanding accounts assigned to him after having first deducted from the gross amount of said outstanding accounts ten (10%) per cent. for discount.

"James Talcott also agrees to loan on demand in check or acceptance to Daly & Schaefer an amount equal to seventy-five (75%) per cent. of the net value of the outstanding accounts arising from the sale of the said consigned goods, after having first deducted from the gross amount of the sales, (1) ten (10%) per cent. for discount (2) all amounts previously loaned on the goods so sold, expenses and commissions, and (3) all failed, or suspended or uncollectible or past due accounts.

"8th. It is agreed that the total amount to be loaned by James Talcott as hereinbefore provided, shall not exceed at any one time the sum of one hundred thousand ($100,000) dollars.

"9th. It is agreed that James Talcott shall not guarantee sales, and that all sales shall be made at the risk of Daly & Schaefer.

"10th. Interest shall be charged and credited on the account current between James Talcott and Daly & Schaefer, at the rate of six per cent. (6%) per annum.

"11th. For his services as factor, supervisor, and selling agent, rendered in pursuance of this agreement, as aforesaid, James Talcott shall receive ten (10%) per cent. commission on the first one hundred seventy thousand ($170,000) dollars of sales, which amount is guaranteed by the said Daly & Schaefer, and five (5%) per cent. on sales over and above that amount, said commission to be computed on the net amount of sales of the consigned goods. James Talcott shall be entitled to the same commission on any insurance moneys which may be payable under any insurance of said consigned goods.

In case any goods so consigned shall not be sold by James Talcott, and the part remaining unsold shall be redelivered to Daly & Schaefer or delivered or transferred to other parties, whether at the termination of this agreement or otherwise, and whether by agreement or direction of Daly & Schaefer, or by act of law, Daly & Schaefer shall pay to James Talcott for his services in connection with the unsold goods a commission of one (1%) per cent. of the total amount due James Talcott for loans, advances, expenses or otherwise, at the time the consignment account is closed, and in addition two (2%) per cent. of the then market value of the said goods so redelivered or transferred.

"12th. As security for any and all loans, and any and all advances made by James Talcott to Daly & Schaefer (whether or not said loans or advances shall be within or shall exceed the limits above mentioned) and for his expenses and his said commissions, and for all outlays of every sort, including all legal expenses and reasonable counsel fees, and for all liabilities which shall be made or incurred by James Talcott in connection with the said business, or by reason of any act done or omitted by Daly & Schaefer, James Talcott shall at all times have a general lien upon all goods now consigned to him or which may at any time hereafter be consigned to him and on all goods now owned or held by Daly & Schaefer, or which at any time hereafter they may in any manner purchase, manufacture or acquire, and upon all proceeds of sales thereof, and upon any and all accounts, notes, drafts, bills receivable or evidences of debt arising from any such sales.

"13th. Daly & Schaefer, subject to the approval of James Talcott, may designate the persons to be employed in and about the sale of the said consigned goods, and in and about the office of the said company, but James Talcott shall not be liable for any of the acts or omissions of any of the persons employed in pursuance of any such designation, and the business of the said agency shall be at all times under the exclusive management and control of the said James Talcott.

"14th. The lease of any premises which shall be used for the transaction of any business under this agreement shall be in the name of, or shall be assigned to James Talcott, and James Talcott shall have actual and exclusive possession and control of the said premises, and of all goods consigned to him thereat.

"On the termination of this agreement and at the request of James Talcott, Daly & Schaefer shall accept an assignment of the unexpired term of the lease of any premises which may be held by James Talcott as aforesaid.

"15th. There shall be conspicuously placed upon any premises which shall be used for the transaction of any business under this agreement, at the entrance thereof or at other place, a sign as follows:

"James Talcott, Factor for Daly & Schaefer.

"16th. It is understood and agreed that James Talcott shall have no connection with and no liability for or upon any purchases, orders or contracts for goods made, given or entered into by Daly & Schaefer, and they shall not be entitled to pledge the credit of James Talcott for any purpose whatever.

"17th. The rights of James Talcott under this agreement, including the right to have, hold and sell the said consigned goods as aforesaid, and to collect and receive the proceeds thereof, and to his said commissions, shall not be affected by any devolution or transfer of the rights or interests of Daly & Schaefer, whether such devolution or transfer shall be by act of the parties or by act of law."

The said agreement was to continue until terminated by either party upon 30 days' notice to the other. Throughout its continuance, and up to the time of filing the petition in bankruptcy, the business was conducted at 19 West Thirty-Fourth street, upstairs; the different amounts of money advanced by the defendant (there was due him at the time of the bankruptcy $120,608.15) being largely used to pay creditors for goods bought and to continue the business. At the time

of bankruptcy the receiver therein took possession of the property and merchandise on the said premises, but subsequently released the same to the defendant under a stipulation providing for the institution of this action to determine the rights of the parties thereto.

The theory of the complainant is that the factor's agreement was a pretense and sham resorted to for the purpose of cheating and defrauding creditors; the intention at the time of making it being, not that the defendant should be the factor and selling agent, but that the entire transaction should be given the semblance of legality, and that the agreement should ostensibly describe a factor's lien in order to render possible the concealment of the property from creditors in the event of bankruptcy. But this claim of bad faith and the claim of a secret lien are not supported by the proofs. On the contrary, I find that in accordance with the agreement large sums of money were, from time to time, advanced in good faith by the defendant, and possession taken by him in good faith of the goods on the premises at the time of making the agreement, and also of the goods thereafter purchased and consigned to him by the purchasing company.

[1] Complainant concedes that the defendant had a valid lien on the accounts for goods sold, which accounts were made payable to him, and hence the principal question to be determined is whether the defendant, for advances made, has a valid lien upon the goods, comprising the stock at the time the bankruptcy proceedings were instituted, which were brought by the bankrupt during the continuance of the factor's agreement and consigned in writing to defendant. The decision of this question depends, I think, entirely upon whether or not such goods were in the possession of the defendant. The law is well settled that liens of this description belong to the class known as possessory liens, the validity of which is determinable by the fact of actual or constructive possession of the property by the lienor.

[2] In Ommen v. Talcott, 188 Fed. 401, 112 C. C. A. 239, a selling agent, factor, or commission merchant was defined by Judge Lacombe as:

"One who sells goods which another person has delivered to him for that purpose and receives compensation for his services by commission or otherwise."

Complainant contends that the case at bar is practically controlled by the case just cited, and by Ryttenberg v. Schefer (D. C.) 131 Fed. 313, but I am of a different opinion. In the Ommen Case the wording of the signs displayed was not such as to impart to the creditors notice of the factorship agreement. In fact, the signs remained as before, save that in addition to the name of the company a few small signs bore the words, "James Talcott Annex." The Circuit Court of Appeals said with regard to this that there was nothing to show that the defendant, or any one in his behalf, was ever in possession, custody, or control of any of the business or property until just before the bankruptcy, and, in criticism of the use of the word "Annex" on the signs to designate a factorship, stated that such wording of the sign rather indicated that Talcott was transacting a business of

his own on the premises occupied by the company than that he was carrying on the business of the company. There was no testimony to show that the defendant had placed a custodian in charge of the business and property, or that any notice whatever of the factor's agreement had been given to commercial agencies; and there seemed, in the opinion of the court, to be a design to conceal the true relationship of the parties.

In the Ryttenberg Case it was substantially held by Judge Holt that for advances made a lien attached to the goods consigned to the defendant, which were in his possession, but that no lien attached to goods bought by the bankrupt and remaining in his possession on his own premises, or to the proceeds realized on their sale. There is, however, in the case at bar stronger evidence in relation to possession by the defendant of the goods bought by the bankrupt, for the defendant here does not wholly rely upon his factor agreement, as in the Ommen and Ryttenberg Cases, nor upon mere constructive possession, but he took possession in good faith, and through one Blum, employed by him as clerk or custodian, who was present daily at the premises during the working hours, he practically supervised and controlled the business. The lease of the premises, as heretofore pointed out, was assigned to the defendant, the rent paid by him, and notice given to the public of his interest in the business as factor by appropriate signs and placards placed where they were most likely to be observed. In fact the precise features upon the absence of which the Circuit Court of Appeals laid stress in the Ommen Case as negativing possession and a valid lien are thought to be here present.

There is still additional evidence tending to show possession in the defendant at the time of bankruptcy, i. e., the possession by the bankrupt of the keys of the premises, the daily opening and closing thereof by his representative, the consignment to him of credits, and the general assignments to him, as well as the large advances made by him from time to time to pay for goods bought and to continue the business. It is also shown that notice of the lien was given to banks with foreign connections, and that many local creditors and a large number of foreign creditors were aware of the existing arrangement, and indeed, it seems to me that sufficient publicity as to the factor's agreement was given to put both foreign and domestic creditors upon inquiry regarding the financial responsibility of Daly & Schaefer, and that they should have made such inquiry at its principal place of business and at the places of deliveries. Such evidence, I think, is entitled to consideration as bearing upon the asserted possession by the defendant of the goods in question, and as to the probability of creditors receiving notice of such possession had they made inquiries in the channels best known to the trade as to the financial responsibility of Daly & Schaefer.

A factor's agreement, by which a lien is given for commissions on sales and for advances on accounts and merchandise purchased, is not an innovation in the conduct of business, especially of the kind in which Daly & Schaefer was engaged. Indeed, there is abundant evidence to prove that there is a custom or usage in this country of

212 F.—18

financing businesses and acting as factor for them. Twelve witnesses have testified to the existence of such a custom or usage, and have stated that information as to the existence of such liens or arrangements is usually given to creditors and others by signs conspicuously placed on the premises where the business is conducted, indicating that the goods of the merchant are in the possession of a factor, and that it is customary to put a representative of the factor in charge of the business and premises, and to notify the prominent commercial agencies of the arrangement. It is my opinion, based on the evidence, that the agreement in question and the subsequent acts of the parties in the present case were in pursuance of an honest intention to create a valid lien for the advances made; and this view is entertained by me notwithstanding the provision in the agreement that Daly & Schaefer were to pay the wages of employés, and had reserved the right to hire the salesmen to sell the goods consigned to the defendant.

The plaintiff argues that there is here no valid lien as against unsecured creditors because the agreement purported to include property not in possession, that is, it included the entire stock of a going concern and stock subsequently acquired. In answer to this contention it is sufficient to point out that the principle of the cases cited, of which Zartman v. First Nat. Bank, 189 N. Y. 267, 82 N. E. 127, 12 L. R. A. (N. S.) 1083, is an example, does not strictly apply to the facts under consideration. In those cases mortgages on property not actually subject to the control of the mortgagors, such as the after-acquired property, were invalid as to a trustee in bankruptcy, but it is important to note that in those cases the possession of the mortgaged property remained in the mortgagor until default in the payment of principal or interest, while in the case of a factor the goods are immediately consigned to him, and he becomes the possessor thereof and sells the same. If the creditors have notice of the manner in which the business is conducted, and that a lien is created, then they presumably deal with the merchant with their eyes open, and not in reliance upon ownership, but rather in reliance upon advances of money made by the factor from time to time in the conduct of the business. Viewed in this light, there is no substantial merit in the contention, assuming the transaction in question to have been an honest one, that the creditors were helpless and at the mercy of Daly & Schaefer and the defendant; for by virtue of the factor's agreement, not only was the business to be continued, but presumably from the loans and advances to be made thereunder the creditors were to receive payment for their goods.

[3] The complainant also contends that according to the evidence, irrespective of any claim of lien by defendant, he has the right to possession on the ground that the transaction was a fraudulent transfer and preference, in violation of the provisions of the Bankruptcy Act; but what has already been said in answer to the previous contention applies here, and no recovery on this ground is warranted. The trustee, however, is entitled to an accounting from the defendant for all the merchandise consigned to him, or its value, and for the accounts collected for goods sold, and for the loans and advances made during the continuance of the factor's agreement.

While other points were elaborately discussed in the briefs submitted on both sides, it is not thought necessary to further advert thereto, in view of the conclusion reached by me that the defendant had a valid lien on the property which is the subject of this controversy.

A decree may be entered in accordance with this decision, but without costs to either party.