RYTTENBERG v. SCHEFER et al.

(District Court, S. D. New York. May 23, 1904.)

1. USURY—COMMISSIONS FOR USE OF CREDIT.
   A commission charged by one commission house to another for the use of its credit under an arrangement by which it guarantied all consignments sent to the second house did not constitute usury.

2. BANKRUPTCY—PREFERENCE.
   A bankrupt cannot be held to have given a preference, recoverable by his trustee, because of sums collected by a creditor after the bankruptcy from third persons under a contract which had been in force between the bankrupt and the creditor for a number of years.

3. CONTRACT—VALIDITY.
   A contract by which a bankrupt commission firm, some years before its bankruptcy, agreed to do all its business through another firm, obtaining the benefit of the latter's credit, held not invalid, as a scheme to hinder, delay, or defraud its creditors.

4. BANKRUPTCY—JURISDICTION OF COURTS—SUIT BY TRUSTEE.
   A court of bankruptcy has jurisdiction by consent of a suit by a trustee to recover a fund for the estate, under Bankr. Act July 1, 1898, c. 541, § 23, 30 Stat. 552 [U. S. Comp. St. 1901, p. 3431], where the defendant appears generally and answers to the merits.

5. FACTORS—LIEN—EFFECT OF CONTRACT BETWEEN COMMISSION HOUSES.
   A commission firm some years before its bankruptcy entered into a contract by which it agreed to do all its business through defendants, composing a second firm, to whom all goods should be consigned, and in whose name all sales and collections were to be made. Defendants were to make advances on consignments, and be responsible therefor. A lease for premises occupied by the bankrupt was assigned to defendants, but the rent therefor was to be paid by the bankrupt, which was to continue to occupy them and carry on the business therein at its own expense. At the time of the bankruptcy there were goods on the premises or in warehouse in the bankrupt's name, some of which had been consigned in defendants' name, and some purchased by the bankrupt, but on all of which defendants had made advances. There were also accounts due for goods sold, made payable to defendants by directions on the invoices sent to purchasers. Held, that the consigned goods were in the possession of defendants, who had a lien thereon, as well as on the accounts due for such goods sold, for their advances and charges, but that goods bought by the bankrupt must be considered as having been in its own possession—the

¶ 1. See Usury, vol. 47, Cent. Dig. § 72.

premises being its own, as between it and defendants—and that defendants, lacking possession, had no lien either upon such goods, or accounts due for those sold, although, as in case of the other accounts, there was a direction on the invoices that they should be paid to defendants, and the bankrupt rendered a periodical statement to defendants, in which all goods were treated as having been consigned to defendants, and all accounts as being their property.

6. EQUITABLE LIEN—INVALIDITY OF LEGAL LIEN.

Where parties attempted by an agreement to give one a factor's lien on property of the other, but such agreement did not create a lien, because possession of the property remained in the debtor, an equitable lien will not arise, although the agreement was made in good faith.

In Equity.

Morris J. Hirsch (Benjamin N. Cardozo and Herbert H. Maass, of counsel), for complainant.

Carter, Hughes, Rounds & Schurman (Charles E. Hughes and Richard E. Dwight, of counsel), for defendants.

HOLT, District Judge. This is a suit in equity brought by the trustee of the firm of Radon & Co., bankrupts, against the members of the firm of Schefer, Schramm & Vogel, to determine the ownership of a fund. Radon & Co. were engaged in the business of commission merchants and dealers in woolen goods, in the city of New York. On December 7, 1897, they made a written agreement with the firm of Schefer, Schramm & Vogel, who were commission merchants in New York, which agreement provided as follows:

"1. Radon & Co. agree to transact all their business through Schefer, Schramm & Vogel. The lease of the premises at 530 Broadway, now occupied by Radon & Co. shall be assigned to Schefer, Schramm & Vogel. All goods at present consigned or owned by Radon & Co. shall be consigned by their respective owners to Schefer, Schramm & Vogel as factors for sale upon commission.

"2. Schefer, Schramm & Vogel agree, on the request of Radon & Co., to advance to the respective consignors two-thirds of the net market value of the goods respectively consigned. Account sales shall be furnished to said consignors monthly and Schefer, Schramm & Vogel agree to discount such sales for the respective consignors.

"Schefer, Schramm & Vogel shall be entitled to a commission of two and one-half per cent. on the net amounts of sales, and interest in the accounts current with said consignors shall be charged and credited at the rate of six per cent. per annum.

"3. Radon & Co. agree to take charge of all said cor 'gned goods for Schefer, Schramm & Vogel and of the sale of said goods, and shall defray all the expenses incident to such sale or to the business conducted at 530 Broadway, including the rent of said premises and the premiums for insurance on the said consigned goods, and shall reimburse Schefer, Schramm & Vogel for all payments made by them for any such expenses. But all sales shall be under the supervision of Schefer, Schramm & Vogel and shall be made in their name and on their behalf, and all goods sold shall be charged on bill heads reading 'Bought of Schefer, Schramm & Vogel.' The terms of sale shall in no case exceed four months from date of bills. Radon & Co. shall furnish to Schefer, Schramm & Vogel monthly accounts of sales made for the respective consignors.

"4. Schefer, Schramm & Vogel do not assume the risk of overadvances and Radon & Co. shall be liable to Schefer, Schramm & Vogel for any loss which may accrue by any such overadvances. An account shall be kept between Schefer, Schramm & Vogel and Radon & Co. which shall be called 'Radon & Co. Guarantee Account.' In this account Radon & Co. shall be charged with

the net amounts of the account sales furnished by them to Schefer, Schramm & Vogel as aforesaid and also with the rent of said premises and premiums for insurance on said consigned goods and with any moneys paid by Schefer, Schramm & Vogel to Radon & Co., or on their behalf, to defray the expenses of the business conducted at 530 Broadway, or for any other purpose in connection therewith, and also with the commissions of Schefer, Schramm & Vogel payable as aforesaid. Radon & Co. shall be credited in said account with all payments upon the sales therein charged as aforesaid and they shall also be credited in said account with all commissions charged to consignors in their respective accounts current with Schefer, Schramm & Vogel.

"Radon & Co. shall at all times pay to Schefer, Schramm & Vogel, for credit to said guarantee account, a sufficient amount of money so that the debit of said account shall at no time exceed seventy-five per cent. of the solvent accounts then outstanding and representing the sales made as aforesaid in the department under the charge of Radon & Co.

"Interest shall be charged and credited in said guarantee account at the rate of six per cent. per annum.

"5. Radon & Co. shall be responsible for the stock of consigned goods of which they shall take charge as aforesaid, and for the management of the sales thereof, and they agree to furnish to Schefer, Schramm & Vogel letters from said consignors in which they shall respectively agree that Radon & Co. shall have the management of their sales and that Radon & Co. alone shall be responsible to them for such management, and that the responsibility of Schefer, Schramm & Vogel to said consignors shall be strictly limited to the financial part of the business entrusted to them as factors as aforesaid.

"6. This agreement shall continue in force for one year from January 1st, 1898, and after said date it shall continue subject to termination by either party upon six months' notice in writing."

Radon & Co. continued to transact business at 530 Broadway for about a year and a half after the making of this agreement, and then removed to 32 Greene street, and continued business there until April 14, 1903. On that day they filed a voluntary petition in bankruptcy, and a receiver was appointed, who on April 15th qualified and took possession of the merchandise at 32 Greene street, and in a warehouse at 41 Thirteenth avenue. Schefer, Schramm & Vogel claimed to have a lien upon such merchandise and the outstanding accounts under the above agreement; and thereafter, under an order of this court, entered upon the consent of all the parties, the merchandise was sold, and the proceeds thereof, together with the proceeds of the outstanding accounts collected by the defendants, were deposited in a trust company, subject to the order of this court. Subsequently, by like consent and order, the money so deposited was delivered to the defendants; they giving a bond to pay to the plaintiff any amount which might be ultimately found to belong to the bankrupt estate.

In pursuance of the above agreement, the lease of the premises occupied by the bankrupts at 530 Broadway, and later of those at 32 Greene street, was assigned by Radon & Co. to Schefer, Schramm & Vogel. Schefer, Schramm & Vogel thereafter paid the rent to the landlord, and charged it to Radon & Co. in their account. Each of these premises consisted of an upper floor. On the street entrance were placed signs of "Radon & Co." On the entrance door of the floor rented were placed two signs—one "Radon & Co.," and below that "Schefer, Schramm & Vogel, Annex." The merchandise shipped by manufacturers was invoiced to Schefer, Schramm & Vogel, and on its arrival at New York was delivered and kept at Radon & Co.'s place of business. Goods were also purchased by Radon & Co., and

delivered and kept at their place of business. The consignment business gradually diminished, and the purchases by Radon & Co. gradually increased, so that for several years before the failure, and at the time of the failure, most of the goods on hand were goods purchased by Radon & Co. The bills for mechandise sold, whether consigned or purchased, had printed on them at the top "Radon & Co., Woolen Commission Merchants, 32 Greene Street," at one side, and "Bought of Schefer, Schramm & Vogel, 476 & 478 Broome Street," on the other side. Later an additional notice was stamped in red ink on the bills for goods sold, as follows:

"When making remittances to Messrs. Schefer, Schramm & Vogel, please mention 'For Department Radon & Co.' All other communications kindly address direct to Radon & Co., 32 Greene Street, New York."

The payment of these bills was generally made to Schefer, Schramm & Vogel directly by the customers. Occasionally Radon & Co. received the payments, in which case they at once turned them over to the defendants. Detailed statements of all goods received from consignors, and of those purchased by the bankrupts, and also statements of all outstanding accounts for sales of goods, either owned by Radon & Co., or consigned to the defendants, were sent to Schefer, Schramm & Vogel by Radon & Co., at first monthly and afterwards quarterly. These statements were at first headed, "Messrs. Schefer, Schramm & Vogel, Stock of Goods consigned by Radon & Co." The headings were afterwards shortened to "Messrs. Schefer, Schramm & Vogel, Radon & Co. Acct.," or similar forms. On the basis of these statements, Schefer, Schramm & Vogel made their advances to Radon & Co. of 66⅔ per cent. on the goods purchased, and of 75 per cent. of the outstanding accounts. The 66⅔ per cent. of the value of the goods consigned by manufacturers was remitted directly to the consignors by Schefer, Schramm & Vogel. When these goods were sold, Schefer, Schramm & Vogel guarantied the sale, and placed the amount of the sale to the credit of the consignor, deducting 7 per cent. commission for their services and guaranty. The net amount so credited to the consignor was charged against Radon & Co., and they were credited with all collections for goods sold. Radon & Co. were also charged with a commission of 2½ per cent. on all sales made of goods either purchased by them or consigned by manufacturers, with the advances made to them on account of stock and outstanding accounts, with interest on the advances at 6 per cent., with the rent of the premises occupied by them, and with any other expenses paid by the defendants in connection with the business of Radon & Co.

At different times part of the stock on hand was deposited in a warehouse at 41 Thirteenth avenue, for convenience, and the warehouse receipts taken in the name of Radon & Co., with the defendants' knowledge and consent. All the stock, whether at 530 Broadway or 32 Greene street, or in the warehouse, was insured by Radon & Co., "Loss, if any, payable to Schefer, Schramm & Vogel"; the insurance premiums being paid by Radon & Co.

The amounts realized since the bankruptcy from the sale of the goods at 32 Greene street was $11,288.47; and of the goods at the

warehouse, $4,880.26. The amount collected on the outstanding accounts was $20,804.62, making a total of $36,973.35. Radon & Co. owe the defendants $48,699.27, and owe the unsecured creditors about the same amount. The question in this case, therefore, is whether all of the assets shall be paid to Schefer, Schramm & Vogel, or shall be distributed ratably among all the creditors.

Several grounds of recovery are alleged in the complaint, some of which, in my opinion, are clearly untenable.

It is urged that the agreement was usurious; the claim being that the 2½ per cent. paid to the defendants as commissions was in fact usury. Aside from the well-settled general rule that a court of equity will not set aside a usurious contract, except on the condition of paying the amount actually due, less the usury (Rogers v. Rathbun, 1 Johns. Ch. 367), and the fact that this rule still applies in New York in the case of a trustee in bankruptcy, notwithstanding the statute abrogating it as to the original borrower (Wheelock v. Lee, 64 N. Y. 242), in my opinion on the merits there was no usury. Schefer, Schramm & Vogel guarantied the consignments, and permitted Radon & Co. to have the benefit of the name and credit of their house under the arrangement made; The contract was a genuine business arrangement, of mutual advantage to both parties, and not a mere cloak to cover usury.

The complainant also claims to recover all moneys collected under the contract by the defendants within four months before the bankruptcy, and since, on the ground that such moneys constituted a preference under the bankrupt act. As to all amounts collected during the four months before the bankruptcy, the evidence, in my opinion, does not establish that the defendants knew or had reasonable cause to believe that it was intended thereby to give a preference. As to moneys collected after the bankruptcy, and the appointment and qualification of the receiver, there could be no preference. A preference, in its legal as well as in its ordinary sense, implies a party who prefers; but a bankrupt, after the appointment of a receiver, cannot, by doing or omitting anything, prefer anybody. He has no longer any title to any property with which he can prefer any creditor, and in fact Radon & Co. did not then do anything to enable the defendants to collect the money.

The complaint alleges that the agreement was void because executed pursuant to a fraudulent scheme and conspiracy to hinder, delay, and defraud creditors. I think there is nothing in the evidence to suggest any fraud, either in fact or in law. The arrangement was a mutually advantageous business arrangement between the parties. It not only was not executed furtively or secretly, but every effort was made to give the arrangement notoriety. It was a perfectly fair and valid transaction, as between the parties, so long as each of them continued solvent. It is the change in their status caused by the bankruptcy of Radon & Co. that gives rise to the serious questions in this case. In my opinion, the claim that the agreement was void as a scheme to hinder, delay, and defraud creditors is entirely untenable.

It may be suggested that, if the plaintiff cannot recover on the ground of a preference or a fraudulent transfer, this court has no jurisdiction. But consent confers jurisdiction in suits by a trustee relating to the bankrupt estate. Bankr. Act July 1, 1898, c. 541, § 23,

30 Stat. 552 [U. S. Comp. St. 1901, p. 3431]; Bardes v. Bank, 178 U. S. 524, 20 Sup. Ct. 1000, 44 L. Ed. 1175. And the defendants, by appearing generally and answering on the merits, consented. Moreover, the suit may be regarded as one to distribute a fund in court.

The serious question in this case is whether at the time of the bankruptcy the defendants had a valid lien on the goods and on the outstanding accounts.

I will consider first the case of the goods which were consigned by manufacturers, and the outstanding accounts representing such goods, and then the goods purchased by Radon & Co., and the accounts representing them.

After the execution of the contract between Radon & Co., and the defendants, the different manufacturers who were accustomed to consign goods to Radon & Co. consigned their goods directly to the defendants. The invoices were made out in the name of the defendants, and sent to the defendants, and the advances were made by the defendants sending their checks directly to the consignors. The goods, when they reached New York, were deposited in the place where Radon & Co. did business; and those which were on hand at the time of the bankruptcy were either there, or in the warehouse in which Radon & Co. had deposited them with the consent of the defendants. Upon these facts, I am not able to see that Radon & Co. had any title to or interest in the goods so consigned. They were invoiced directly to the defendants. If, as defendants claim, the premises at 32 Greene street were the premises of the defendants under the assignment of the lease, then they were kept in the premises, and were in the actual possession of the defendants. If, on the other hand, Radon & Co. are to be regarded as the tenants and occupants of those premises, then the arrangement by which Schefer, Schramm & Vogel deposited the goods in the custody of Radon & Co. did not differ in its essential respects from any arrangement which they might have made with the owners of a warehouse or with any other parties to deposit the goods in their custody. Radon & Co. held them simply as an agent or depository for the defendants. It was a pure case of a consignment of goods to a factor acting under a del credere commission, who had a lien on the goods for his advances. Schefer, Schramm & Vogel had the right of possession. There are cases which hold that a factor, having made advances, has the rights of a vendee. Grosvenor v. Phillips, 2 Hill, 147; Bailey v. Hudson R. R. Co., 49 N. Y. 70. Such a factor can maintain replevin or trover for the goods, but, of course, a factor is not an actual vendee. The relation between the principal and the factor is fiduciary. The title to the goods, until sold, remains in the principal; and when sold the proceeds belong to the principal, subject to the lien of the factor for advances and other charges. Baker v. New York Nat. Exchange Bank, 100 N. Y. 31, 2 N. E. 452, 53 Am. Rep. 150; Matter of Chambers, 17 App. Div. 343, 45 N. Y. Supp. 264. The entire title and right of possession, therefore, was either in the consignors or in Schefer, Schramm & Vogel. If the goods while at Radon & Co.'s store had been levied upon on an execution against Radon & Co., the levy would, in my opinion, have been good for nothing. If the premises are to be regarded as those of Radon & Co., they were goods held by them as an

agent or trustee for the defendants, and their trustee in bankruptcy, upon his appointment, took no title to them.

I think the same conclusion must be reached as to the outstanding accounts for the sales of such consigned goods. The goods when sold by Radon & Co. were invoiced as bought of Schefer, Schramm & Vogel, and the purchasers were directed to pay the price to Schefer, Schramm & Vogel. There is no evidence that in the case of this class of goods the purchaser supposed he was buying the goods of Radon & Co. Radon & Co., before the contract with the defendants, had been acting as commission agents for the same or similar manufacturers. But if any purchaser supposed he was purchasing from Radon & Co. merchandise belonging to Raden & Co., I cannot see that that would make any difference. If Radon & Co. had undertaken to sell these consigned goods as their own, they could not have given title as against the consignor, any more than a warehouse keeper could give such title. As against Schefer, Schramm & Vogel, it is possible that Radon & Co.'s general authority to sell would have enabled the purchaser to obtain title as against their claim; but in that case it could be only in the case of a purchase in good faith, for full value paid. From any point of view, I think that the outstanding accounts for goods consigned by third parties are to be considered as in the possession of the defendants, and that the complainant took no title to them.

The case of the goods bought by Radon & Co. stands on quite a different footing. When the contract between Radon & Co. and the defendants was made, Radon & Co. were accustomed to make small purchases on their own account. Thereafter their method of doing business changed. The consignments diminished, and their individual purchases largely increased. When Radon & Co. purchased goods themselves, they bought directly from the sellers, and paid for them with their own checks. The goods were delivered by the sellers to Radon & Co. at the premises where they did business. Such goods as were unsold at the time of the bankruptcy were either at such premises, or had been placed in a warehouse; the warehouse receipts being taken in the name of Radon & Co. Schefer, Schramm & Vogel claim a lien upon these goods. The substantial facts on which they base that claim are that the lease was assigned to Schefer, Schramm & Vogel; that the name of Schefer, Schramm & Vogel was placed on the door; that, by the agreement, Radon & Co. were to consign the goods to Schefer, Schramm & Vogel, as factors, for sale on commission; that Radon & Co. rendered monthly statements purporting to consign these goods to the defendants; and that the defendants made advances on the goods to Radon & Co.

The contract between Radon & Co. and the defendants contains no explicit agreement in reference to a lien. It is a contract by which Radon & Co. agree to transact all their business through the defendants, and that all their goods should be consigned to the defendants, as factors, for sale upon commission. The defendants' claim in this case is based on an inference that they have the same lien upon the goods which remained at Radon & Co.'s store and at the warehouse which they would have had if the goods had been delivered to them at their own store for sale on commission. But it is elementary law

that a factor's lien is purely that of a pledgee, and that possession, either actual or constructive, is essential to the validity of a pledge. There can be no question in this case that there was no actual possession, unless on the ground that the premises were the premises of Schefer, Schramm & Vogel.

The defendants claim that the premises were in their possession, because of the assignment of the lease by Radon & Co. to them, and because the defendants paid the landlord the rent. But by a contemporaneous agreement it was agreed, in substance, that the defendants should permit Radon & Co. to continue to occupy the premises, and charge them in the account current with the rent paid. The old, familiar rule of law is that an assignee of a lease by assigning it frees himself from all liability. The defendants paid the rent to the landlord, but I think, if the landlord had sued them for the rent, and they had contested their liability for it, it is doubtful whether the landlord could recover. Without determining, however, the strict question of law, I think that, in this suit in equity, Radon & Co. must be deemed to have been in possession of those premises, and not Schefer, Schramm & Vogel. A court of equity looks through the form to the substance. The substance of this transaction was that Radon & Co., having a lease of the premises, made an agreement to obtain the assistance of Schefer, Schramm & Vogel in financing their business. For that purpose, Schefer, Schramm & Vogel agreed to make advances to them, and both parties wanted to give the defendants such a lien as a commission merchant usually has, while leaving the goods in the custody of Radon & Co. As one step taken to apparently comply with the rule that possession is essential to a pledge, Radon & Co. made a formal assignment of the lease; but it was part of an agreement by which it was understood that Radon & Co. were to continue their occupation of the premises, and were in fact to pay the rent. If the defendants had undertaken to turn Radon & Co. out of the premises and use them for their own purposes, I think that any court of equity would have enjoined them.

The fact that the name of Schefer, Schramm & Vogel was placed on the door seems to me indecisive. The name of Radon & Co. was alone on the door at the street entrance, and was on the door at the entrance to the floor which they occupied. Below it on the floor entrance was the sign, "Schefer, Schramm & Vogel, Annex." I do not think that these signs indicated with any clearness who was the tenant or the actual occupant of the premises. If there were any distinction to be drawn, I should infer that it might be a little in favor of Radon & Co., who had occupied the premises before. They were apparently Radon & Co.'s principal place of business, and the term "Annex" tended to indicate that they were used for some subsidiary purpose by Schefer, Schramm & Vogel. I think the signs are entitled to very little weight as evidence in determining who was in the possession and occupancy of the premises, and they certainly do not affirmatively establish that Schefer, Schramm & Vogel were in possession of the premises, and that Radon & Co. were not.

The fact that every month Radon & Co. rendered a statement to the defendants of the goods in their store, which described the goods

substantially as being consigned by Radon & Co. to Schefer, Schramm & Vogel, in my opinoin, did not effect a consignment. To "consign" means to deliver into the care and control of another; to intrust or commit. A man cannot consign a thing to another by merely saying that he consigns it, any more than he can deliver it by mere words. The attempt of Radon & Co. to consign these goods to the defendants by sending them a statement in which they said that they did so, in my opinion, was entirely futile. The goods were not thereby consigned. They remained in the possession and custody of Radon & Co., and not of Schefer, Schramm & Vogel.

The fact that the defendants made advances on these goods to Radon & Co. has no bearing on the question whether Radon & Co. held them in pledge. The fact that it is stated in the agreement that all sales were to be made under the supervision of the defendants is immaterial. They were not in fact made under such supervision. The defendants had no representative on the premises, and in fact exercised no supervision over the sales.

My conclusion is, therefore, that the defendants had no lien on the goods on hand at the time of the bankruptcy which had been purchased by Radon & Co. The question remains whether they had a lien on the outstanding accounts representing goods purchased by Radon & Co. that had been sold. These goods were sold by Radon & Co. to purchasers. The defendants had nothing to do with such sales. When the contract of sale was made, the obligation of the purchaser was to pay the price to Radon & Co. The defendants claim that they had a lien on these accounts on the grounds already discussed in regard to their claim of lien on the unsold goods which had been purchased by Radon & Co., and on the additional grounds that, pursuant to the agreement, these goods were invoiced to the purchaser on bill heads reading, "Bought of Schefer, Schramm & Vogel;" that such invoices contained at the foot a direction to the purchaser to make remittances in payment to Schefer, Schramm & Vogel; and that, by the terms of the contract, all sales were to be made under the supervision of Schefer, Schramm & Vogel, in their name and on their behalf. The fact that the goods were invoiced on bill heads which had at the top, "Bought of Schefer, Schramm & Vogel," and at the foot a suggestion that the remittances in payment should be sent to Schefer, Schramm & Vogel, did not change the fact that the contract originally was between Radon & Co. and the purchasers. A purchaser, after the receipt of such an invoice, might safely remit the proceeds to Schefer, Schramm & Vogel, if he saw fit, but he might decline to do so if he saw fit. He had made no contract with Schefer, Schramm & Vogel. His contract had been made with Radon & Co., and if he had refused to pay to Schefer, Schramm & Vogel, and had made a proper tender of the amount due to Radon & Co., he would have complied with his contract, and no action could have been brought against him by Schefer, Schramm & Vogel to recover the purchase price. Moreover, so far as the invoice is concerned, there was nothing delivered to the defendants conferring any rights upon them. The direction at the foot authorizing remittances to be made to Schefer, Schramm & Vogel was noth-

ing more than a consent or direction for such a payment, which in law was revocable at any time as between Radon & Co. and the purchaser of the goods.

The fact that these accounts were included in the monthly statement rendered by Radon & Co. to the defendants is perhaps the strongest piece of evidence in the case in favor of the defendants' claim. But I do not think that the rendition of such a statement amounted to a transfer of the claim. There was no formal assignment of the account. There was nothing delivered to the defendants which, in my opinion, would have constituted sufficient evidence to enable the defendants to maintain a suit against the purchasers of the goods on the ground that they owned the claim. It was an attempt in the case of the accounts, as in the case of the goods, to transfer something by saying that it was transferred, without actually doing anything sufficient to transfer it.

The defendants claim that, if there was no pledge at common law in this case, there was an equitable lien. Courts have undoubtedly gone far in some cases to uphold an equitable lien for the protection of parties who have made advances under agreements for liens. It is difficult to reconcile all the cases. But in my opinion, under all the circumstances of this case, there is no adequate proof of an equitable lien. In the first place, it must be borne in mind that there was no specific agreement for an equitable lien. The agreement was simply that Radon & Co. should do their business through the defendants, and that all their goods, whether consigned or owned, should be consigned to the defendants as factors for sale upon commission. The entire claim of the defendants for a lien is based on the assumption that they did act as factors, and that Radon & Co. did consign all the goods which they had to them, and that therefore they have the lien which the law gives a factor on the goods and the accounts. The arrangement undoubtedly was made in entire good faith. The parties supposed that what was done had the effect in law to give the defendants a factor's lien. But in my opinion, it did not give such a lien in respect to the proceeds of the goods that Radon & Co. purchased. All the cases which have been called to my attention in which the facts are somewhat similar to those of this case, and in which an equitable lien has been upheld, are cases in which either there was a specific agreement for a mortgage or a lien of some kind, or the goods, although remaining about the premises of the party giving the lien, were set apart in a lot or room leased to the party to whom the lien was to be given, and were delivered into the custody and control of an agent of the person to whom the lien was to be given.

The simple fact in this case is that Radon & Co. wanted to obtain advances without delivering possession of the property, and Schefer, Schramm & Vogel wanted to acquire a lien without taking possession of the property. It was one of the numerous attempts to give a lien by owners of property while retaining the apparent ownership of it. The law denies any validity to such arrangements whenever bankruptcy occurs and the rights of general creditors are involved. As is well stated in the leading case of Casey v. Cavaroc, 96 U. S. 467, 24

L. Ed. 779, the opinion in which contains a very able discussion of the general principles applicable to the decision in this case:

"The requirement of possession is an inexorable rule of law, adopted to prevent fraud and deception, for, if the debtor remains in possession, the law presumes that those who deal with him do so on the faith of his being the unqualified owner of the goods."

Undoubtedly, in certain cases, if the legal possession of securities pledged has once passed, it is competent for the pledgee to permit the pledgor, as his agent, to temporarily resume possession of the securities for convenience of collection. Clark v. Iselin, 21 Wall. 360, 22 L. Ed. 568; Carter v. Arguimbau, 31 Abb. N. C. 3. But there must be first a transfer of possession. See Re Rodgers, 125 Fed. 169, 60 C. C. A. 567; Moors v. Reading, 167 Mass. 322, 45 N. E. 760, 57 Am. St. Rep. 460; Nisbit v. Macon Bk. & Trust Co. (C. C.) 12 Fed. 686; Porter v. Parmley, 52 N. Y. 185; Tedesco v. Oppenheimer, 15 Misc. Rep. 522, 37 N. Y. Supp. 1073.

My conclusion is that the plaintiff is entitled to recover the amount of the proceeds of the goods which Radon & Co. purchased, whether sold before or after the bankruptcy. I do not recall that there is any evidence in the case which fixes the exact amount of the proceeds of such goods, as distinguished from the proceeds of the consigned goods. If the parties cannot agree upon that amount, there should be a reference to ascertain the amount.