In re NATHAN & COHEN CO., Inc.

IRVING TRUST CO. v. COMMERCIAL FACTORS CORPORATION.

District Court, S. D. New York.
April 25, 1932.

Krause, Hirsch & Levin, of New York City (Sydney Krause, of New York City, of counsel), for plaintiff.

Hughes, Schurman & Dwight, of New York City (Charles E. Hughes, Jr., Frank C. Fisher, and Phillip W. Haberman, all of New York City, of counsel), for defendant.

COXE, District Judge.

This is a suit by the bankruptcy trustee of Nathan & Cohen Company, Inc., to set aside preferential transfers alleged to have been made to the defendant. The bankrupt was an old and favorably regarded converting house in New York City, and had been for a number of years prior to the filing of the bankruptcy petition on April 20, 1931, factored by the defendant, and its predecessor, Peierls, Buhler & Co., Inc., under a factoring agreement, dated August 16, 1926. This agreement provided, not only for advances against merchandise, but also for the purchase by the defendant of accounts receivable resulting from merchandise sales. The advances were for general operating expenses and the payment of current bills; and at the time of the bankruptcy the in-

debtedness to the defendant amounted to about $195,000.

It was the practice of the bankrupt in arranging for the payment of merchandise purchase bills to send the invoices to the defendant just prior to maturity, with a request for an advance to make the payment; and the defendant would then draw checks in payment, and send them direct to the respective creditors. The invoices were invariably stamped by the bankrupt with a rubber stamp, before being forwarded to the defendant, which purported to transfer to the defendant all of the bankrupt's title and interest in and to the merchandise covered by the different invoices.

In the early part of March, 1931, it was discovered by the defendant that there were a large number of unpaid merchandise invoices which had neither been rubber stamped nor forwarded to the defendant. The goods represented by these invoices had, however, been delivered at the bankrupt's place of business at 60 Leonard street, New York City, during the period from December, 1930, to March, 1931, and a considerable quantity had been finished and sold by the bankrupt prior to March 1, 1931, and the receivables resulting therefrom transferred to the defendant; the remaining merchandise was either in finished or unfinished condition at 60 Leonard street, or at the finishers, or subject to the defendant's control.

The total amount of these unpaid purchase invoices (Exhibits 11 and 12) was about $199,000, and on March 20, 25, and 27, 1931, the invoices were, at the defendant's urgent request, stamped by the bankrupt in the customary manner, and transmitted to the defendant. It is these transfers that the trustee contends are preferential and should be set aside, to the extent that the merchandise represented by them can be traced, and remained unsold, as of some date when the defendant had reasonable cause to believe preferences were intended.

The trustee insists that the defendant did not have a valid possessory lien upon the merchandise represented by these purchase invoices because of defective possession. It is also contended that there was no constructive lien upon the merchandise, under section 45 of the New York Personal Property Law (Consol. Laws, c. 41), until the invoices themselves were rubber stamped and transmitted to the defendant, following the usual course of procedure; and that

this was not done until March 20, 25, and 27, 1931, when the defendant had reasonable cause to believe preferences were intended. The argument is, in substance, that, in the factoring agreement of August 16, 1926, the bankrupt agreed "to consign, or cause to be consigned" to the defendant "all silk and cotton goods heretofore or hereafter manufactured, converted or dealt in" by the bankrupt, thereby requiring some formal and affirmative action on the part of the bankrupt to subject specific merchandise to the factors' lien; and that the merchandise represented by the invoices in question (Exhibits 11 and 12) was not "consigned" to the defendant until the invoices had been rubber stamped and forwarded to the defendant on March 20, 25, and 27, 1931.

The contention of the defendant, on the other hand, is that it had a valid factor's lien, not only at common law, but under the New York statute, and, also, that nothing more was required to perfect the lien than the delivery of the merchandise at the bankrupt's place of business at 60 Leonard street, New York City; it is insisted, therefore, that the stamping of the invoices, and their transmission to the defendant, was surplusage, and ineffective to impugn or defeat the factor's lien at common law or under the statute.

▮ I am satisfied that the defendant had a valid common-law possessory lien. The notice to the public was clearly adequate; it included the usual sign on the door, appropriate legends on the letterheads, bill forms, and other documents used by the bankrupt, and a long-continued course of dealing with the trade, which expressly recognized the existence of the factoring arrangement. Indeed, the relation of the parties was so generally proclaimed, and universally understood, as to preclude any serious contention that any one was misled or deceived.

I think, also, that the defendant's possession has been satisfactorily established. Miss Harris, the defendant's representative, McAvoy, the stockman, and Ross, the receiving and shipping clerk, were in the defendant's employ, and were paid directly by it. Ross had the keys of the store, and opened and closed the doors each business day, and no merchandise was permitted to leave the premises without the permission of the defendant's representatives. Then, too, there was the sublease in the defendant's name, which, although for a purely nominal rental, gave the defendant power, if it so desired, to exclude the bankrupt from the property. It

is true that the salaries of McAvoy and Ross, and the other expenses directly incurred by the defendant under the agreement, were reimbursed by the bankrupt through the medium of the commission account; but this did not destroy the defendant's possession or undermine the factor's lien. Miss Harris, McAvoy, and Ross, were none the less employees of the defendant, even though the money used to pay their salaries was ultimately reimbursed by the bankrupt; and the sublease was nevertheless a lease, notwithstanding the fact that the rent was purely nominal.

It was not necessary for the defendant completely to usurp the functions of the bankrupt's employees in order to maintain its possession; for the business was that of the bankrupt, not of the defendant, and manifestly it could not be successfully conducted if the defendant was allowed to dominate the operations, and exclude the bankrupt's employees from their regular duties. In none of the recent cases dealing with factoring arrangements has any such idea been advanced. Boise v. Talcott (C. C. A.) 264 F. 61; In re Spanish American Cork Products Co. (C. C. A.) 2 F.(2d) 203; In re Merz (C. C. A.) 37 F.(2d) 1.

■ The defendant's lien is protected also under section 45 of the New York Personal Property Law (Consol. Laws, c. 41). Concededly, the requirements of this section, with respect to the filing of notice of lien, and the posting of a proper sign on the premises, were complied with; and the only point seriously pressed by the trustee is that, under the factoring agreement of August 16, 1926, the bankrupt merely agreed to "consign, or cause to be consigned," the merchandise to the defendant; and that no lien, therefore, came into existence until the purchase invoices were stamped and transmitted to the defendant. It is, I think, a sufficient answer to this contention that the word "consign" means physical delivery. Ryttenberg v. Schefer (D. C.) 131 F. 313, 321; Block v. Columbian Ins. Co., 42 N. Y. 393, 403. And when, in the agreement, the bankrupt undertook to "consign, or cause to be consigned," merchandise not then in being, it merely meant that the merchandise, as produced and purchased by the bankrupt, would be delivered to the defendant, and then become subject to the factor's lien.

This is emphasized by the provision in the agreement itself that the merchandise is to be consigned to the defendant "at No. 60 Leonard Street," indicating that the parties had in mind a physical delivery there, and not any formal written assignment, such as contained in the wording of the rubber stamp. Moreover, it was usually 60 to 90 days after the delivery of the goods at 60 Leonard street before the invoices were in the usual course transmitted to the defendant for payment; and during this interval general advances were made to the bankrupt, and the goods were, in many instances, finished and sold. Yet, according to the trustee's contention, the factor's lien was, during all this period, in a state of suspended animation, and did not attach until there was some formal documentary transfer to the defendant. Such an interpretation of the agreement is, I think, not only unsupported by the language used, but is entirely at variance with the practice of the parties over a long-continued period of time.

■ On the remaining issues of the case, I am clear that the bankrupt was hopelessly insolvent when the bankruptcy petition was filed on April 20, 1931, and I think this condition existed as far back as January 1, 1931. I am satisfied, though, from a careful reading of the testimony of defendant's witnesses in the 21-A examination, that the defendant had no knowledge of the insolvency until after the completion of the first inventory on March 17th, and probably not until after the first Touche Niven report had been received on March 25th. The only really disquieting sign prior to that time was the National Credit Report, which was in the possession of the defendant at least as early as February 16th or 17th; and it was this report which was the subject of discussion among defendant's officers during the latter part of February, as shown by the interoffice memoranda introduced in evidence at the trial. But it is, I think, clear from the testimony of Messrs. Blumenthal, Achelis & Becker that, during the entire period of these discussions, the defendant was ignorant of the real condition of the bankrupt, and had no suspicion of any wrongdoing.

It was not altogether unnatural, either, that the defendant should have been deceived, as the bankrupt had always enjoyed an enviable reputation in the trade, and Mr. Nathan stoutly asserted that the net worth of his company was ample for all credit purposes. However, the taking of the new inventory was determined upon in order to set at rest the rumors in the trade regarding the financial condition of the company, and to enable a new balance sheet to

be issued. The trustee contends that the manner in which this inventory was taken indicates knowledge of insolvency on the part of the defendant; but there was nothing unusual in having a large force engaged on such an undertaking at that time of the year, as it was necessary to work rapidly in order not to interfere unreasonably with the conduct of the business. I think, also, that the delay in completing the figures has been satisfactorily explained, and that it was in no way a suspicious circumstance. Furthermore, during the first two weeks of March, the defendant made substantial advances to the bankrupt; and, even as late as March 13th, there was a check for $6,000 for the general operating expenses of the business.

I am satisfied, therefore, that no unfavorable inference can properly be drawn against the defendant until March 25, 1931, when the first Touche Niven report was received; and immediately after that the trade was notified of the actual condition of the bankrupt, and the business came to an end.

It follows that the complaint must be dismissed.