### SWETNAM v. EDMUND WRIGHT GINSBERG CORPORATION.
### Civ. No. 7–363.

District Court, S. D. New York.
March 18, 1941.

Shaine & Weinrib, of New York City, for plaintiff.

Dills, Muecke, Schelker & Levinson, of New York City, for defendant.

BYERS, District Judge.

The plaintiff trustee in bankruptcy, who has insufficient assets in hand to pay creditors in full, seeks to avoid the assignment and transfer of accounts receivable, of the asserted value of $94,278.30, by the Deford Company, bankrupt, during the four months prior to July 20, 1938, when it filed a voluntary bankruptcy petition in the United States District Court for the Western District of Virginia.

The Deford Company was engaged in converting green hides into leather at its plant in Luray, Virginia, and its business office was located in Baltimore, Maryland.

The bankrupt had been insolvent from early in 1937, to the knowledge of the defendant, but the latter denies reasonable cause to believe that it was receiving a preference by reason of the matters alleged.

The defense rests upon an agreement between the bankrupt and the defendant dated November 25, 1936, which constituted the defendant the factor of the bankrupt, whereby it became entitled to retain and collect the said accounts receivable.

The agreement is annexed to the answer, and is too voluminous to be set forth in full. Its relevant provisions may be epitomized as follows:

The defendant was constituted the exclusive factor for the bankrupt and thus was to acquire merchandise and accounts receivable to be consigned to or pledged with it, and against which it was to make advances to the bankrupt; the instrument recited a present pledge, assignment, transfer and delivery to the factor of "all the right, title and interest of Deford in and to hides and leather as it may from time to time purchase or manufacture", which were to be and remain collateral security for advances theretofore or thereafter to be made from time to time, to be paid by Deford to the factor at its office in New York.

Tanning operations for others were permitted on the part of Deford but apparently there were none, and the identity of the pledged products was agreed to be maintained.

The pledged hides and leather at cost or net fair market were agreed to be maintained in the ratio of $133.33 to each $100 advanced or loaned, and the former figure was to be subject to determination by the factor.

Absolute and exclusive possession and dominion over the pledged property was agreed to result from the lease of buildings Nos. 14 (hide house), 17, 22 and 55 (leather warehouses), and 25 (warehouse office) by the bankrupt to the factor; the contract period was from October 14, 1936, to December 31, 1938, subject to earlier termination by the payment of all advances; the lease was to be automatically renewed or extended as might be required by operations under the contract.

Signs were to be erected and maintained on the said buildings, and the latter were to be locked as the factor might deem fit.

Deford agreed to do any and all other things that factor might require in order effectually to show the public or any persons interested that said hides and leather had been pledged to, and were in the exclusive custody, control and dominion of the factor.

The latter might have one or more representatives at the plant to supervise and have charge of the said leased premises and to act as custodian of the pledged property; if an employee of the bankrupt should be selected to act in that capacity, he was to be taken off the pay roll of the bankrupt and to be paid by the factor.

A right of way over the bankrupt's premises, to permit of free and unrestricted access to and egress from the said premises, was included in the contract.

Deford waived and released the factor from any and all duties and liabilities as lessee under the common law or the statute law of Virginia except the obligation to pay the rental; Deford released the factor from any loss, damage or injury by shrinkage, shortage or discrepancies or theft of the pledged property on the part of the factor or its representatives.

Notification to the Federal Reserve Bank of Richmond of the pledge was to be given,

and the form of lease was to be satisfactory to that institution.

Written leases were to be prepared and delivered and filed and recorded. All hides were to be taken from the hide house to the tannery by Deford for the purpose of tanning, and each hide was to be stamped so as to identify it as covered by the pledge; when manufacturing and processing had been completed, the leather was to be delivered into the possession of the factor at its warehouse buildings Nos. 17, 22 and 55.

Insurance was to be carried by Deford, and the policies were to be delivered to the factor, in default of which the factor could procure insurance and charge the premiums to Deford.

Inventories were to be furnished to the factor from time to time, as were reports concerning the hides in process of being converted into leather.

Deford was to market and sell the pledged leather to customers whose credit should be passed on by the factor, and at prices not less than the amounts of the loans advanced. The factor was to have complete control over the credit risks and shipments and deliveries.

All accounts arising from shipments were agreed to become immediately the property of the factor, as to which the agreement recited a present°sale, assignment and transfer, and an undertaking to execute further instruments as might be required, upon the understanding that the accounts should become the property of the factor immediately upon shipment; invoices were to bear this legend: "This account is assigned to Edmund Wright Ginsberg Corporation, 159 Madison Avenue, New York, N. Y., and is payable to them exclusively." A copy of each invoice with transportation receipt was to be delivered by Deford to the factor, and the latter reserved the right to have shipment made in its name.

Monthly statements of the advances to Deford were to be rendered, and the factor's commission was 2% for its services.

Selling expenses were to be paid by Deford, and all payments made to the latter on accounts assigned to the factor were agreed to be held in trust for the latter, and immediately turned over without deduction.

The contract provided that "Deford agrees to have and maintain a sign in a conspicuous place at the entrance to its principal office at the plant at Luray, to read as follows: 'Edmund Wright Ginsberg Corporation—Factors' and to maintain such other signs as factor may require."

The factor was to have the right to declare all amounts advanced by it to be at once due and payable, in the event of bankruptcy or other similar happening, or if litigation should be instituted against Deford; in such event, the factor had the right to sell the hides, leather and other property pledged, by private sale, the proceeds to be applied to the advances, etc.

The contract was agreed to be effective as of October 14, 1936, and until December 31, 1938.

There is no substantial dispute as to the facts, and both attorneys presented the controversy in an atmosphere free from petty contention, and with the evident purpose of concentrating upon the merits of the cause.

It is evident that the contract was entered into in good faith, and that the advances which it contemplated were actually made, to the extent of hundreds of thousands of dollars, and that the factor believed that it had the right to collect the accounts receivable which are in dispute; it is equally clear that the defendant knew of the insolvent condition of the Deford Company at least as early as October of 1937.

It is necessary to an understanding of this litigation that something be said of the history of the bankrupt, the circumstances leading up to the making of the contract, and the nature of the bankrupt's business.

Seemingly, the enterprise was founded in 1821, and has been conducted by the same family through the intervening years; the Deford Company which was doing business in 1934 underwent a reorganization in 1935 under the then Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, and in connection therewith bonds and debentures were issued, which probably accounts for the desired consent of the Federal Reserve Bank of Richmond, as stated in the contract.

For lack of capital, the business of the company was difficult, if not impossible, of prosecution, and so in 1936 the contract with the factor was consummated.

There was nothing clandestine or commercially objectionable about the arrangement, and no reason appears for scrutinizing the defendant's case in a spirit of hostility; moreover quotations from judicial opinions in other cases do not in-

evitably delimit the path to present adjudication, in the absence of closely parallel facts.

■ For instance, the requirement frequently stated and much relied upon by the plaintiff, that possession of the pledged property must clearly and unmistakably pass to the pledgee (Casey v. Cavaroc, 96 U.S. 467, 24 L.Ed. 779; Security Warehousing Company v. Hand, 206 U.S. 415, 27 S.Ct. 720, 51 L.Ed. 1117, 11 Ann.Cas. 789; Hamilton Ridge Lumber Sales Corporation v. Wilson, 4 Cir., 25 F.2d 592; Ryttenberg v. Schefer, D.C., 131 F. 313; Ommen v. Talcott, 2 Cir., 188 F. 401; In re Merz, 2 Cir., 37 F.2d 1), is so well established in the law that it is not open to discussion. The word "possession", however, is not a self-expounding term, and what may be required to establish possession where negotiable securities, or a stock of goods or wares is at stake, is not necessarily to be exacted in a case involving raw materials and their necessary processing to accomplish conversion into marketable merchandise.

Here possession of the green hides, in the physical sense, and their resale by or for the factor were not the purpose of the parties; they contracted for the financing of the purchase of the hides and the conversion of them into marketable leather; this means that the curing, tanning and finishing operations were necessarily to be performed by the bankrupt; the marketing of the ultimate product was in express terms for the account of the factor, so that its investment as well in the finishing process as in the purchase of the hides might be repaid from the proceeds of sales and deliveries of the leather. It is in this light, therefore, that the asserted conformity by the parties with applicable legal principles must be adjudged.

Moreover, it appears that most of the creditors are the holders of bonds and debentures; a small percentage of them are merchandise creditors, which is understandable from the nature of the bankrupt's business. The Deford Company could not buy hides unless the defendant would finance their purchase, and its only merchandise requirements were for necessary supplies. .

The tanning operations were conducted in a rural community, on premises of an undisclosed acreage, entrance to which was had over a private road connected with the main highway, and the plant consisted of many buildings (mostly of frame construction) scattered over the property, of which the buildings referred to in the contract and the written lease, and their dimensions were:

No. 14 (hide house) was 34 by 111 feet.

No. 17 (leather warehouse) was 40 by 128 feet, with an addition, 40 by 54 feet.

No. 22 (leather warehouse—the storage and shipping building) was 60 by 100 feet.

No. 55 (leather warehouse) was 30 by 150 feet.

No. 25 (warehouse office) was 12 by 24 feet.

As has been stated, the business office of the Deford Company was in Baltimore, and it is a reasonable inference that merchandise creditors conducted their transactions in that office rather than at the plant; this has its bearing upon the plaintiff's argument that the signs displayed at the plant were inadequate; it also tempers the impact of the frequently quoted rule that the possession of the subject of the pledge must be open, complete and "without deceptive combinations which lead third persons into error as to the real possessor of the thing." Security Warehousing Company v. Hand, 7 Cir., 143 F. 32, at page 41.

In a case also involving goods which had to undergo processing, where a factor's lien was discussed (Irving Trust Company v. Commercial Factors Corporation, 2 Cir., 68 F.2d 864, at 866), Judge Swan said: "The chief reason for the rule requiring delivery of possession in order to create a valid pledge is to prevent possession by the pledgor [Deford here] from giving him a false credit."

What the evidence discloses as to the way in which the contract was performed throughout the entire period from November, 1936, to June, 1938, may be thus summarized:

Long, the assistant to Kendrick (the superintendent of the plant) was specially designated and employed by defendant, and his social security card so disclosed, to act as custodian of the hides and leather, and the leased buildings; his name was removed from the pay roll of Deford and his salary was paid by the defendant; at the end of 1937 his total salary was charged back to the bankrupt by the defendant, but from January to July of 1938 that was not done, so that he was paid only by the defendant during those six months.

550

He continued to function under the new arrangement in all substantial respects as prior to the date of the contract; he did, however, inform himself generally as to the receipt of green hides and their delivery to the hide house (building No. 14), and after December 1, 1936, each hide was stamped separately with the symbol referred to in the contract, for the purpose of tracing it through the finishing processes. He kept a record in a note book of the number of hides in the hide house, and the number that were delivered to the tannery, for his own information and that of the Ginsberg Corporation.

There were four sets of keys to these various buildings, one of which was at all times in the possession of Long, the custodian; another in that of Kendrick, the superintendent; a third in that of the Vice-President of the Deford Company, and the fourth remained in the warehouse office; the doors of the buildings covered by the lease (other than the hide house) were locked at night and unlocked in the morning, usually by Long and sometimes by Kendrick.

It cannot be said that Long was the exclusive custodian of the hides and finished leather in the sense that none of the latter moved from the plant except with his authority, since sales were made by the Baltimore office and deliveries to customers followed selling instructions or shipping orders received from that office. Deford operated the selling department, since that was part of its business, but all invoices plainly stated that the proceeds of the sale were payable to or for the account of defendant, and it controlled the distribution, through its own credit department.

When the Irving Trust Company v. Commercial Factors Corporation case, supra, was in the District Court, Judge Coxe used language which seems to be entirely appropriate to this case (58 F.2d 670 at 672):

"It was not necessary for the defendant completely to usurp the functions of the bankrupt's employees in order to maintain its possession; for the business was that of the bankrupt, not of the defendant, and manifestly it could not be successfully conducted if the defendant was allowed to dominate the operations, and exclude the bankrupt's employees from their regular duties. In none of the recent cases dealing with factoring arrangements has any such idea been advanced."

The Circuit Court of Appeals did not differ with the District Court on the question of the common-law possessory lien.

The testimony does not suggest how any more efficacious custody could have been exercised either by Long, or by a corps of officers and directors of the defendant company, had they been present at all times on these premises to observe the tanning operations. Once it is realized that the latter were necessarily conducted by the Deford Company, it becomes apparent that possession of the hides and the unfinished leather, during the process of conversion, had to be something less than meticulous, although it was complete as against Deford, and was so intended by both parties to the contract.

There is the added important circumstance that no hides or leather were in the plant, during the entire period involved, except such as were purchased and converted with the defendant's money, which excludes the possibility of confusion between the property pledged to the defendant and separate hides and leather belonging to the bankrupt or to other persons or firms.

This plant was remote from the paths of trade; creditors dealing with Deford are not shown to have visited the premises for the purpose of selling hides and tanning supplies, or otherwise; thus the opportunity for being misled to their detriment, by reason of the necessarily informal nature of the defendant's possession, was absent.

Signs reading "Edmund Wright Ginsberg Corporation, Factor for the Deford Company" were placed on the outside of each of the three warehouses (Nos. 17, 22 and 55) and on the hide house (No. 14), and on the outside and inside of the warehouse office of the plant (No. 25). Cardboard signs were used at first, but for them were promptly substituted brass plates, 16 by 4 inches, containing black letters 1 inch high. The cardboard signs were white with black lettering, and of the same size as the metal ones, and when placed inside the building were put in conspicuous places; that on the warehouse office was on the front door.

Some of the buildings were painted so as to display, in large letters that could be read from a considerable distance, the name of the Deford Company. This was true also as to the water tower. If such letter-

ing as the smaller signs contained had been added to this display of the Deford name, there is no reason to infer from the evidence that the holders of the bonds and debentures of the company, who constitute the great majority of creditors, would not have become such; it is reasonable to suppose that their status antedated November 1, 1936.

The sales of finished leather were controlled by the defendant precisely as the contract provided; that is to say, it passed upon all credits initially, and there were furnished to it, each month, sales reports, from which checkings were made to ascertain that the credit limits were not exceeded.

Deliveries of leather were made from the plant at Luray only upon shipping orders issued from the Baltimore office, which also reported, as has been stated, to the defendant company in respect of all purchases of hides and sales of leather.

Insurance was carried in the name of the defendant "as interest may appear" according to the terms of the contract; also the leather purchased from time to time was consigned to the defendant, as delivered. As has been stated, invoices accompanying sales of leather by their terms were payable to the defendant, duplicates being sent from the Baltimore office to the defendant's office.

Several mercantile agencies were advised of the contract with the factor, and made reports to the trade from time to time, thus:

Feakes Mercantile Agency, Inc., dated March 2, 1937, which recited the reorganization under Section 77B of the Bankruptcy Act in 1935, and the contract entered into with Edmund Wright Ginsberg Corporation, factors, in October of 1936, whereby the latter "would finance their accounts receivable and also procure additional financing aid through the medium of advances made by that channel for the purchase of hides".

Dun & Bradstreet, Inc., dated April 19, 1937: "The company's sales are factored through a New York Finance company."

The Shoe & Leather Mercantile Agency, Inc., dated May 6, 1937: "The company is factoring its accounts with Edmund Wright Ginsberg Corporation of New York City. The last statement is not a creditable one, * * * no estimate of present responsibility can be advanced and for other than small favors, the extension of credit would be a matter of individual judgment." That of same Agency dated November 16, 1937: "The company continues factoring arrangements with Edmund Wright Ginsberg Corp. of New York, N. Y."

The foregoing seem to effectually dispose of any suggestion that the mercantile community could have been kept in the dark as to the defendant's interest in the hides and leather as received and processed by the bankrupt.

Due to falling prices, the sales by the Deford Company began to dwindle in October and November of 1937, and tanning operations did not continue after October 1st because the defendant insisted that the merchandise on hand would have to be moved before it could advance any more money. It was known to the defendant at that time that the Deford Company was insolvent, in the bankruptcy sense, because of the decline in value of leather.

Liquidation of the inventory proceeded as rapidly as possible during the early months of 1938, and the defendant continued to receive assignments of accounts receivable as it had from the inception of the contract, and during the four months ended July 20, 1938, such assignments of the face value of $100,276.33 were made by the bankrupt to the defendant, and the amount of these collected by the defendant was the total sum of $93,450.72, which in round figures represents the sum involved in this cause; during that period, advances were made by the defendant to the bankrupt in the sum of $4,600.

Thus it will be seen that the contract was adhered to in all matters of performance, with reasonable fidelity and in such detail that no taint of bad faith or concealment emerges from a study of the evidence.

Reference should now be made to a defense introduced at the opening of the trial, based upon Virginia law:

In 1936 and thereafter there was in effect a provision of the statutes of Virginia reading as follows: "If any person transact business as a trader, with the addition of the words 'factor,' 'agent,' 'and company,' or 'and co.,' and fail to disclose the name of his principal or partner by a sign in letters easy to read, placed conspicuously at the house wherein such business is transacted, and also by a notice published for two weeks in a newspaper (if any) printed in the city, town or county wherein the same is transacted; or if any person transact such business in his own

552

name, without any such addition; all the property, stock, and choses in action acquired or used in such business shall, as to the creditors of any such person, be liable for the debts of such person. This section shall not apply to a person transacting such business under a license to him as an auctioneer or commission merchant." Code Va.1936, § 5224.

Pursuant to the foregoing, the proof shows that the following advertisement was published in "Page News and Courier", a semi-weekly newspaper published in Luray, twice a week for two weeks in December, 1936: "Notice is hereby given that Edmund Wright Ginsberg Corporation, a New York Corporation, of 159 Madison Avenue, New York, N. Y., herein called Factor, is factor for The Deford Company, a West Virginia corporation, of Baltimore, Maryland, and Luray, Virginia, herein called Deford, and that Deford sells, assigns and transfers to Factor all accounts arising from the shipments of leather, and that Deford has pledged with and will continue to pledge with Factor hides and leather at the plant of Deford at Luray, Virginia, as collateral security for loans and advances made or to be made from time to time by Factor to Deford, all in accordance with an agreement between the parties."

Compliance with the quoted statute served at least to apprize the immediate community that those who might become creditors of Deford could not look to the hides and leather at the plant as available to them for the purpose of levying judgment; it was also public notice of Deford's relations with the factor, and may well have led to inquiries by the mercantile agencies, with the results which have been shown.

Whether compliance with the act, in and of itself and without reference to the other evidence, is sufficient to defeat the plaintiff's cause, seems not to require decision. Presently it is deemed to constitute additional evidence that all requisite publicity was given to the legal relationship established and consistently maintained under the contract in question.

There was nothing unfair to other creditors about the contract; nor was there anything clandestine or surreptitious about its performance, and the equities of the case as a whole are deemed to lie with the defendant.

To discuss all the cases cited by industrious counsel, in their very helpful briefs, would unnecessarily prolong this opinion. No case has been brought to light which involves a state of facts closely comparable to those under examination.

■ I am satisfied from the evidence that the defendant has established a possessory common-law lien upon the hides and leather which were embraced within the accounts receivable sought to be recovered by the plaintiff in this action, and that the latter passed by assignment to the defendant in due and customary course of dealings between the bankrupt and its factor.

Since the matters involved were concluded before the effective date of the amendments to the Bankruptcy Act referred to as the Chandler Act, decision depends upon whether the defendant had "reasonable cause to believe that the enforcement of such * * * transfer would effect a preference"—that being requisite in addition to the knowledge of insolvency which was conceded. 11 U.S. C.A. § 96, sub. b.

The conclusion, that there was created such a lien as has been stated above, negatives a belief that a preference would be effected through the receipt of the assigned accounts, and the appropriation of their proceeds in liquidation of the advances which had been made during the twenty months that the contract had been in force.

It results that a decree must be rendered for the defendant, which is to be settled, together with findings, on notice.