## IRVING TRUST CO. v. COMMERCIAL FACTORS CORPORATION.

### In re NATHAN & COHEN CO., Inc.
### No. 85.

Circuit Court of Appeals, Second Circuit.
Jan. 15, 1934.

Krause, Hirsch & Levin, of New York City (Sydney Krause and George C. Levin, both of New York City, of counsel), for appellant.

Hughes, Schurman & Dwight, of New York City (Charles E. Hughes, Jr., Phillip

W. Haberman, Frank C. Fisher and Frederick W. P. Lorenzen, all of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge.

Prior to adjudication upon an involuntary petition in bankruptcy filed April 20, 1931, Nathan & Cohen Company, Inc., was an old and favorably known silk and cotton converter doing business at 60 Leonard street, New York City. Its business consisted in purchasing greize goods from various mills, sending them to dyers and finishers for processing, which is known as "converting," and selling the finished goods. The business was financed by Commercial Factors Corporation under a factoring agreement dated August 16, 1926. In the latter part of March, 1931, when the bankrupt was concededly insolvent and when, as the trustee in bankruptcy contends, the factor knew or had reasonable cause to know of its insolvency, certain merchandise of the bankrupt was transferred to the factor as security for or payment of an indebtedness for prior advances. Such merchandise, or accounts receivable resulting from its sale, the trustee seeks to recover. Its bill of complaint contains two counts; one based on section 60b of the Bankruptcy Act (11 USCA § 96 (b), the other on section 15 of the New York Stock Corporation Law (Consol. Laws N. Y. c. 59). Only the former is relied upon on this appeal. After trial the District Court dismissed the bill, stating in its opinion that the factor had a valid lien upon much of the merchandise in question and that knowledge of the bankrupt's insolvency was not chargeable to the factor until after March 18th, the critical date now asserted by the plaintiff, although at the trial an earlier date was claimed.

As to the main part of the goods there was no preference because the factor proved a valid lien under section 45 of the New York Personal Property Law (Consol. Laws N. Y. c. 41). This section provides that liens upon merchandise, or the proceeds thereof, "created by agreement" for the purpose of securing advances made upon the security of the merchandise, shall be valid without delivery of possession, provided the conditions specified in the statute are complied with. These relate to displaying the factor's name conspicuously at the entrance of the building where the goods are located, and filing a notice of lien in the office of the register of the appropriate county. The purpose of the statute is to allow the intent of the parties to be effective, under the prescribed conditions of notoriety, without regard to questions of possession. It is conceded that a sufficient sign was displayed at 60 Leonard street and that a proper notice was filed in New York county. The dispute is whether the parties intended to create a lien by their factoring agreement. The agreement leaves no doubt about that; by the second paragraph the bankrupt agreed "to consign" to the factor at 60 Leonard street all goods dealt in by the bankrupt, and the eleventh paragraph provided that the factor should have a general lien upon all goods consigned to it by, or on behalf of, the bankrupt. It was, however, the practice of the bankrupt to send to the factor unpaid invoices of purchased merchandise and to rubber-stamp upon them an assignment of the bankrupt's interest in the merchandise represented thereby. The plaintiff contends that the assignment stamped upon the invoices was the agreement which created the lien. This contention cannot be sustained. It is plain that the goods were consigned to the factor irrespective of the stamped assignment and, in general, long before the invoices were so stamped, for usually the invoices were not delivered to the factor until just prior to their maturity, which might be 60 or 90 days after the goods had been delivered at 60 Leonard street. The factoring agreement provided elaborate machinery to secure to the factor control of merchandise from the moment of its receipt at the bankrupt's place of business. The bankrupt executed a formal lease of the premises to the factor at a nominal rental. Three of the factor's employees worked there daily; they were Ross, the receiving and shipping clerk, McAvoy, the stock room clerk, and Harris, the billing clerk. Ross had keys and testified to locking the building at night and opening it in the morning. All goods received at 60 Leonard street or shipped therefrom came under the control of one or more of these employees, and an elaborate procedure involving the use of printed forms was put into effect. Thus the factor obtained effective control of the goods as soon as they were delivered at the premises. This was the consignment contemplated by the factoring agreement, and the stamped assignment can be regarded as nothing more than an added and unnecessary precaution. In connection with all outshipments, printed forms were used which gave full notice that the factor, not the bankrupt, was the shipper or consignor. We

hold that upon all goods located at 60 Leonard street before March 18, 1931, the factor had a valid lien under the statute.

The District Court sustained the lien not only under the statute but also as a valid possessory lien. In adopting the former ground we are not to be understood as disapproving the latter. Upon that it is unnecessary to pass.

██ In addition to goods delivered at 60 Leonard street, there are three other classes of goods to be considered: (1) Goods shipped directly from the mills to the dyers before March 18, 1931, and delivered in their converted condition on or after that date at 60 Leonard street; (2) goods returned by Schreiber who held them on consignment for sale; and (3) goods purchased and delivered on or after March 18th. These will be discussed seriatim.

As to goods sent directly from the mill to the dyer, the factor could have no lien under section 45, since the statutory conditions were not complied with in respect to them. It is clear, however, from the factoring agreement that the parties intended the lien to cover such goods. The eleventh paragraph granted a general lien on all goods consigned to the factor by, or on behalf, or for the account of the bankrupt, "whether at dyers, finishers, selling offices, warehouses or elsewhere." In the case of goods going direct from the mill, the practice of the bankrupt was to send the dyer a "process sheet." This stated that the goods were consigned by the factor and were to "remain" its property. We see no reason why the intention of the parties to give the factor a lien upon goods in the hands of dyers should not be given effect. The chief reason for the rule requiring delivery of possession in order to create a valid pledge is to prevent possession by the pledgor from giving him a false credit. This reason ceases when the thing pledged is not in the possession of the pledgor but of a third party. Hence it has been held that property so situated may be pledged without any change of possession or control if notice of the fact of the pledge be given to the person in possession. Pierce v. Nat. Bank of Commerce, 268 F. 487 (C. C. A. 8), and cases therein cited. It is but a short step to the situation here presented: The delivery of goods to a bailee with instructions to hold them for the account of another (the factor). The New York cases indicate, although the precise situation has not been clearly passed upon, that such a deposit amounts to a pledge to the person for whom the goods are held

and that the depositary becomes bailee for him. See First Nat. Bank v. Exchange Nat. Bank, 179 App. Div. 22, 153 N. Y. S. 818, 164 N. Y. S. 1092, affirmed 226 N. Y. 633, 123 N. E. 368; Hickok v. Cowperthwait, 210 N. Y. 137, 103 N. E. 1111, Ann. Cas. 1915B, 1002. We hold that the factor had a valid lien upon goods delivered from the mill to the dyers and by them held as bailees of the factor. Therefore receipt of the goods by the factor after March 18 did not deplete the bankrupt's estate and could not be a preference, even if the factor was chargeable with knowledge of the insolvency. Israel v. Woodruff, 299 F. 454 (C. C. A. 2); Petition of Chattanooga Savings Bank, 261 F. 116 (C. C. A. 6).

██ The goods returned by Schreiber are governed by similar principles. Indeed, the factor's position is even stronger as to them, for they had been in stock at 60 Leonard street before shipment to Schreiber and so were subject to the factor's lien before being consigned to Schreiber for sale. They were packed for shipment to him upon "manipulation memos" which, like the "process sheets" above referred to, named the factor as consignor and declared that the goods covered thereby should "remain the property" of the factor. The bills of lading named only the factor as shipper. Under these documents it is clear that Schreiber was intended to receive and hold the goods as bailee of the factor, not of the bankrupt. The possession of goods on consignment may give the consignee a deceptive credit of which his creditors might conceivably complain, but as between the bankrupt and the factor there is no reason for not recognizing and giving effect to their intention to make Schreiber bailee for the factor. No creditors whom the plaintiff represents have been deceived by Schreiber's apparent possession. Although the factor seems to have had some doubt of the validity of its lien and sought to get an acknowledgment from Schreiber that he held the goods for it, this was an unnecessary precaution and does not affect the legal relations of the parties. There was no preference in receiving these goods from the factor's bailee.

██ The remaining goods are those purchased by the bankrupt on or after March 18th and so delivered after the date when, according to the plaintiff's contention, the factor had knowledge of the bankrupt's insolvency. The only proof as to the date of the purchase and delivery of this merchandise is found

in the dates of seven invoices. Three of these are dated March 17th, and as the goods may have been delivered on that date, these may be cast aside. There remain four invoices, aggregating $5,116.80, and bearing dates March 19, 20, and 21. The factor argues that the dates given on the invoices are insufficient proof of the dates of delivery of the merchandise; that the latter may have been delivered before its invoice date. Counsel points to the fact that Exhibit 1, containing a list of all invoices and covering more than 200 transactions, shows eight instances where the process sheets are earlier in date than the invoice relating to the same goods; hence he says the invoice dates are unreliable as a test of delivery dates. The difficulty with this argument is that so far as appears these eight instances may have related to merchandise sent direct from the mill to the dyer. In such a case we can easily imagine that the process sheet sent by the bankrupt might antedate the invoice sent by the mill; but it seems most unlikely that the mill would ship goods before it invoiced them. Consequently in the absence of contradictory evidence we believe that the invoices (admitted without objection) were sufficient proof of the delivery dates. It is therefore necessary to consider the evidence as to the factor's knowledge of insolvency on the 19th, 20th, and 21st of March.

The District Court's opinion finds that a condition of hopeless insolvency existed as early as January 1, 1931, but that the defendant had no knowledge of the insolvency until after the completion of the first inventory on March 17th. This conclusion is the result of conflicting testimony of witnesses seen by the judge, and we accept it. The opinion also states that "no unfavorable inference can properly be drawn against the defendant until March 25, 1931, when the first Touche Niven report was received." This conclusion necessarily rests largely on the testimony of Mr. Blumenthal and other witnesses testifying under 21-A examinations. Hence the District Court, like ourselves, has seen only the record of their testimony, and we are more free to differ from his conclusion. The facts which lead us to do so can be set out fairly briefly, although the record is most voluminous.

The inventory completed on March 17th showed a total value of about $230,000. This was some $40,000 less than it should have been according to the "theoretical inventory" kept by the factor from day to day on the so-called "advance card," and about $200,000

less than Mr. Nathan had predicted that it would be. The discrepancy caused the factor serious concern. Mr. Blumenthal says (fol. 1639) that he decided to put the factored account on a 50 per cent. basis (instead of continuing at 66⅔ per cent.) and to ask Friedman, vice president of the bankrupt, what he intended to do about it. He summoned Friedman to a conference on the morning of March 18. Blumenthal testified (fol. 1640) as follows:

"Q. All right, what conversation did you have with Friedman, Henry Friedman on the 18th of March? A. We wanted to have his accountant go in and immediately and furnish us a balance sheet.

"Q. Did you tell him why? A. Yes, on account of the difference of inventory, we wanted to know the whole status of the company.

"Q. You then had doubts in your mind? A. Starting at that point."

That the factor was alarmed is further evidenced by its efforts to strengthen its security position. Under date of March 18th it wrote Schreiber for an acknowledgement that he was holding consigned goods as its agent, and it caused the bankrupt to write him on the same date. It requested from the bankrupt delivery of all unpaid invoices, stamped with the customary assignment. As previously indicated, both these precautionary measures were unnecessary to the validity of the lien, but they strongly corroborate Mr. Blumenthal's statement that his doubts started at that time. On March 20, 25, and 27 unpaid invoices were sent the factor aggregating $199,000. It is conceded that as soon as knowledge of these invoices came to the factor, the bankrupt's insolvency was beyond question. The plaintiff contends that the factor's employees must have learned of the invoices while taking the inventory. Mr. Blumenthal admits that they should have demanded all invoices whether due or not, but denies that he himself knew of them until they were delivered; nor does any other officer of the factor admit earlier knowledge. The men who actually made the inventory and might have seen the invoices at that time were not called to testify. But the essential question is not when the factor actually learned, but when its officers were put upon inquiry and could have learned. Concededly they were put upon inquiry as to the bankrupt's condition on the 18th, for Blumenthal then demanded that an accountant furnish a balance sheet. On the preceding day and before the pricing of the inventory was completed,

Mr. Becker had had luncheon with Mr. Nathan and was informed by him that the inventory was expected to show approximately $450,000, and that against it there were only debts of $37,000 to dyers and of $40,000 to $50,000 for merchandise delivered but not paid for. When Mr. Nathan's prediction fell so wide of the mark as to the inventory, we think the reasonable and natural thing to do was to check at once the accuracy of his statements as to unpaid bills. They were as essential as the inventory to determine the factor's position. We find nothing to indicate that such an inquiry of the bankrupt's employees would not have produced the information. Miss Schaffner testified that she kept the invoices and was accustomed to deliver them to the bankrupt for payment on Mr. Nathan's instructions. But she did not say that she would not even give information about them without Nathan's orders. There is no testimony that the factor was ever denied access to the bankrupt's records; indeed, Blumenthal admits that his men always had free access to the invoices (fol. 1655). It is true that not all the invoices were delivered at once when requested. This does not imply that information concerning them would have been concealed, but merely that Miss Schaffner would not deliver them except upon orders, according to her custom. No explanation is given as to why they were delivered in instalments. It is true also that on the 18th, Blumenthal demanded a balance sheet, and that the accountant got to work on the 20th and produced a report on the 23d, which was followed by the taking of the second inventory and the Touche Niven audit. Although the insolvent condition was not actually disclosed to the factor's officers before the 23d, they were put upon inquiry at least as early as the morning of the 18th. A prudent factor would immediately have sought information as to unpaid bills. Such an inquiry would, as it ultimately did, have disclosed the insolvency. The Bankruptcy Act does not permit a creditor who has been put upon inquiry to accept security for prior advances up to the very moment when he gets actual knowledge of what the inquiry will disclose. Accordingly the goods delivered after March 18th were received when the factor had reasonable ground to believe that a preference would result.

▆▆▆ There remains to be considered the factor's argument that the factoring agreement created an equitable lien and that the taking of actual possession of the goods relates back to the date of the agreement which was more than four months before bankruptcy. The question must be determined by New York law. Finance & Guaranty Co. v. Oppenhimer, 276 U. S. 10, 12, 48 S. Ct. 209, 72 L. Ed. 443. With respect to a mortgage of after-acquired property, it is settled that while the mortgage will create an equitable lien upon the property, when it comes into existence, as against simple creditors or purchasers with notice, it will not prevail against the legal lien of an attaching or execution creditor, Rochester Distilling Co. v. Rasey, 142 N. Y. 570, 37 N. E. 632, 40 Am. St. Rep. 635; nor as against a trustee in bankruptcy, Zartman v. First National Bank, 189 N. Y. 267, 82 N. E. 127, 12 L. R. A. (N. S.) 1083. In the latter case the mortgagee had taken possession, but this did not save him since it occurred after the mortgagor's insolvency and within four months of bankruptcy. See, also, Corney v. Saltzman, 22 F. (2d) 268 (C. C. A. 2). It would seem that the New York rule is the same as to an agreement to pledge after-acquired property. Mathews v. Hardt, 79 App. Div. 570, 80 N. Y. S. 462; see, also, Titusville Iron Co. v. City of New York, 207 N. Y. 203, 209, 100 N. E. 806; Diana Paper Co. v. Wheeler-Green Elec. Co., 228 App. Div. 577, 240 N. Y. S. 108, 109. The factor, however, argues that the law recognizes a distinction between pledges and mortgages and that in the case of a defective pledge the date of the agreement rather than the date of the subsequent taking possession will be looked to. No New York authority directly supports the argument. Parshall v. Eggert, 54 N. Y. 18, and Goldstein v. Rusch, 56 F. (2d) 10 (C. C. A. 2), are particularly relied upon. In the former the chattels were in existence when the purported pledge was made and possession was taken before any rights of creditors intervened. Furthermore, the opinion states as one ground of decision that the situation may be viewed as though the property had been delivered to the pledgee and by him redelivered to the pledgor to be held as bailee according to the terms of the receipt. Cf. National Bank v. Rogers, 166 N. Y. 380, 59 N. E. 922; Sexton v. Kessler & Co., 225 U. S. 90, 32 S. Ct. 657, 56 L. Ed. 995; Hickok v. Cowperthwait, 210 N. Y. 137, 103 N. E. 1111, Ann. Cas. 1915B, 1002. In the Goldstein Case there was a valid assignment of accounts covering sold merchandise, and an agreement that any returned goods should be held for the assignee. The returned goods stood in the place of the validly assigned account, hence no preference resulted from taking possession of them with

knowledge of the assignor's insolvency. These cases are quite different from the case at bar, where no lien, legal or equitable, could be created until the goods were acquired by the bankrupt. At that time the bankrupt was insolvent and the factor was charged with knowledge of it. To take possession within the four months period under such circumstances is a preferential transfer. Mathews v. Hardt, 79 App. Div. 570, 80 N. Y. S. 462.

For the foregoing reasons the decree of dismissal must be reversed. A decree should be entered for the plaintiff for the value of the goods covered by the invoices dated subsequent to March 18th, with interest. It is so ordered. Each party will bear its own costs of the appeal.