### IRVING TRUST CO. v. BANK OF MAN-HATTAN TRUST CO. et al.

District Court, S. D. New York.
June 20, 1934.

Charles Seligson, of New York City, for plaintiff.

Blumberg & Parker, of New York City (S. Blumberg, of New York City, of counsel), for Bank of Manhattan Trust Co.

Blake, Stim & Curran, of New York City (M. Stim, of New York City, of counsel), for defendant Jacob Rubin.

COXE, District Judge.

This is an action by the trustee in bankruptcy of Levin Furniture Company, Inc., to set aside preferential transfers of $9,000, alleged to have been made by the bankrupt within four months of bankruptcy; and the case has been tried and submitted solely under section 60b of the Bankruptcy Act (11 USCA § 96 (b).

The bankrupt was a New York corporation, engaged in selling cheap furniture on long-term installment contracts, with offices at 2253 Third avenue, New York City. Nathan Levin was the president and operating head of the business; and Jacob Rubin, father-in-law of Levin, was a stockholder, and

loaned money to the company on the security of assigned accounts. The company had a line of credit at the Sixty-Ninth street office of the defendant bank, which was opened in the early part of 1929 with loans of $15,000; it also maintained at the same branch a general checking account. The loans made by the bank were at all times evidenced by notes of the bankrupt bearing the indorsements of Nathan Levin and Jacob Rubin, and the bank also held the written guaranty of Jacob Rubin, dated February 28, 1929, guaranteeing payment of the indebtedness up to $15,000.

The transfers which the trustee seeks to set aside as preferential were made to the bank by the Levin Company at various times between September 29, 1931, and December 10, 1931, in payment of past-due unsecured notes of the Levin Company indorsed by Nathan Levin and Jacob Rubin; and it is the trustee's contention that these payments effected preferences with respect to all three of the defendants.

The involuntary bankruptcy petition was filed on December 23, 1931, and the adjudication took place on January 8, 1932. The total gross receipts of the receiver and trustee were $5,879.48, and the net estate, as of January 23, 1934, is $2,487.

On December 22, 1930, the Levin Company owed the bank $10,750, evidenced by four notes, all bearing the indorsement of Nathan Levin and Jacob Rubin, namely, $1,250 due December 23, 1930; $5,000 due January 27, 1931; $2,500 due February 16, 1931; and $2,000 due April 13, 1931. The bank at that time had in its files a balance sheet of the Levin Company as of February 1, 1930, showing total assets of $132,596.47; liabilities of $68,457.04; and capital and surplus of $64,139.43. There were, however, no detailed figures to support the statement, and the accounts receivable appeared merely as one item of $91,495.95. When, therefore, Levin appeared at the Sixty-Ninth street office of the bank on December 22, 1930, to obtain a renewal of a note falling due the following day, he was questioned closely by Harvey, the manager of the branch, regarding the condition of the business and the nature of the assets and liabilities; and it was stated by Levin that the 1931 figures would "probably show up as well if not better than the previous year." Harvey was also told that the company had "about $90,000 outstanding, each account averaging about $100.00."

The balance sheet of the Levin Company as of January 2, 1931, was received by the bank about January 14, 1931, and showed assets of $117,376.14; current liabilities of $52,698.53; reserves for depreciation of fixed assets of $4955.85; and net worth of $59,721.76. The accounts receivable item appears at $86,547.77, but no reserves were shown for bad or doubtful accounts; and there were no detailed figures with respect to the 1930 operations. This balance sheet was not at all satisfactory to the bank; and on January 14, 1931, Harvey wrote Levin, requesting the "operating details of the company for the year 1930" and "an explanation" of a number of questionable items appearing on the statement. Harvey also wrote on the same day to the manager of the Metropolitan avenue office of the bank, asking for information regarding the financial condition of Jacob Rubin, one of the two indorsers of the Levin notes.

On January 24, 1931, Harvey had another interview with Levin at the bank, at which Levin explained that there had been set up against the accounts receivable a reserve of $3,000. Harvey considered this totally inadequate, and severely criticized some of the items of the balance sheet. He told Levin that, in view of the character of the business, and the fact that the installment contracts ran for such long periods, it would be necessary to obtain further capital. He also insisted that the loans carried by the bank should be entirely paid off "at least once a year"; and Levin agreed that this would be done.

The notes maturing January 27, 1931, and February 16, 1931, were renewed for three months; and on March 10, 1931, Harvey wrote Levin, calling attention to the fact that the Levin Company was not maintaining the usual 20 per cent. balances in the checking account, and again insisting that the loans be liquidated; yet, when the next note of $1,250 fell due on March 23, 1931, the balance to the credit of the account, which had stood at $1,457.78 on January 1, 1931, had fallen to $929.09; and, instead of the note being paid, it was renewed for a further period of three months. There was also similar action with respect to the notes maturing April 13 and 27, 1931, but, when the next note of $2,500 fell due on May 15, 1931, it was renewed only for one month instead of three months, as formerly.

In the meantime, the deposit balances had continued well under the 20 per cent. minimum; and on March 30, 1931, Harvey made a notation in the credit file, after examining the financial statement of Jacob Rubin as of March 2, 1931, as follows: "The whole thing comes down to this point, that when we obtain

a cleanup from the Levin Furniture Company we shall have to be very careful before we go ahead with them again."

On June 1, 1931, Harvey again wrote Levin about the smallness of the balances, and called attention to a previous promise made by Levin "to deposit direct with us rather than through the Chase National Bank." This communication did not, however, produce any tangible results; for on June 23, 1931, when the note for $1,250 matured and was paid, the balance in the account had fallen to $84.92.

On June 25, 1931, Harvey wrote Levin, insisting that the notes be "paid in full" as they matured; but, notwithstanding the urgent tone of this letter, the two notes for $2,-000 and $2,500, maturing July 13 and 15, 1931, respectively, were further renewed for periods of one month each. Moreover, on July 14, 1931, a check for $87.20, drawn by the Levin Company on the account, was dishonored for insufficient funds. This was followed on July 27, 1931, by the receipt of a check for $500, drawn on the Chase account, in partial payment of the note for $5,000 falling due on that date; and the balance of $4500 was renewed until August 27, 1931.

On August 27, 1931, when this $4,500 note again fell due, the balance in the account was $31.30, and the $4,500 note was further renewed to September 28, 1931. There were also renewals for one month of the two other notes for $2,000 and $2,500, maturing September 14 and 15, 1931, respectively, although on September 14, 1931, the account showed an overdraft of $5.70.

In the latter part of September, 1931, Harvey sent the entire file of the Levin Company, with other files relating to loans which had been criticized by the bank examiners, to the executive department of the bank for review; and on September 26, 1931, Fisher, of that department, made a comprehensive analysis of the file; his contemporaneous memorandum containing this significant comment: "From the top-heavy condition of last statement it is evident this loan is undesirable save as it may be good by Rubin's endorsement."

It was also recommended in the memorandum that additional information be obtained from the Levin Company regarding "full operating details," "age of accounts receivable," "basis of inventory valuation," and other matters.

At about this time, Levin requested from Harvey a further extension of the note for $4,500, falling due on September 28, 1931,

and was referred to the executive department. The $4,500 note was, however, protested for nonpayment on September 28, 1931; and, on that day, a check for $1,500, drawn on the Chase account, was received and credited to the account; and on September 29, 1931, this $1,500 was applied by the bank in reduction of the indebtedness. On the same day, Harvey wrote Levin two letters, in one of which he stated that the protested note would be kept in "Past Due Bills until it is paid," and requested the additional information suggested by the executive department; and, in the other, he insisted on the immediate transfer of the Chase account to his office.

On September 30, 1931, Levin and Herman H. Rubin, son of Jacob Rubin, went to the executive department and conferred there with Danmeyer and Bucklin, in an effort to obtain a further extension, but met with no success; and the notation made by Danmeyer after the interview concludes as follows:

"The obligation has been a steady one and was criticized by the bank examiners. We will continue to carry our note past due, and if it is not paid immediately, we will start action against the makers and endorsers.

"Advised Mr. Harvey accordingly."

On October 1, 1931, Levin conferred with Harvey, and advised him that the balance of $3,000 due on the $4,500 note would be paid as soon as possible; and on October 6, 1931, a check for $3,000 was received by the bank, drawn on the Chase account. This money was obtained by means of a loan from Louis Rubin, Levin's brother-in-law, on notes of the Levin Company, secured by an assignment of accounts receivable amounting to approximately $8,000.

By October 10, 1931, the credit of the Levin Company seems to have disappeared entirely, for on that date a check for $500, drawn on the Chase account, was refused payment, and a note for $101.50, payable at the Manhattan Bank, was "returned short"; and on October 14, 1931, Levin asked Harvey for renewals of the two notes for $2,000 and $2,500, maturing October 14 and 15, 1931, respectively, and was refused. It was then arranged that payment would be made by the Levin Company at the rate of $100 and $200 a day; and this disposition was reported to the executive department on October 15, 1931, and approved. Thereafter the Levin Company paid $100 daily to the bank until the entire indebtedness was liquidated on December 10, 1931; and these payments were made by means of forty-five checks, all drawn on the Chase account, and cleared through the ac-

count of the Levin Company in the Manhattan Bank. The balance in the account, after making the last payment, was $64.16; and the bankruptcy followed within two weeks thereafter, or on December 23, 1931.

The proof offered by the trustee shows clearly that the Levin Company was insolvent within the definition of the Bankruptcy Act on September 29, 1931, and at all times subsequent thereto, and up to the filing of the bankruptcy petition on December 23, 1931. Grandison v. National Bank (C. C. A.) 231 F. 800; Irving Trust Co. v. Manufacturers' Trust Co. (D. C.) 6 F.Supp. 185. On September 29, 1931, the accounts receivable, consisting of the balances on the installment sales contracts, were carried on the books at $73,276.16; although on nearly half of the accounts there had been no collection in 1931, and there were substantial balances on which nothing at all had been paid for over two years. The accountants for the trustee estimated that these accounts were fairly worth not more than $20,666.67 on September 29, 1931; and I consider such a valuation extremely liberal. It is also in harmony with the testimony of Lubliner, who expressed the opinion that accounts representing balances on installment sales contracts such as written by the Levin Company should be deemed doubtful where no payment had been made for three months, and bad when in default for six months. The deficiency of assets on September 29, 1931, as shown by the accountants' figures, amounted to $23,745.30; and a similar analysis as of December 24, 1931, indicated insolvency at that time to the extent of $56,829.82.

It remains only to consider whether the defendants had reasonable cause to believe that the payments to the bank would effect preferences; and the question is, not whether the defendants had actual knowledge, but rather what a man of ordinary prudence is to be charged with from the facts established by the evidence. Pender v. Chatham Phenix Nat. Bank & Trust Co. (C. C. A.) 58 F.(2d) 968, 970; Brown Shoe Co. v. Carns (C. C. A.) 65 F.(2d) 294, 297; Irving Trust Co. v. Commercial Factors Corp. (C. C. A.) 68 F.(2d) 864, 867.

The instability of the Levin Company first suggested itself to the bank after the January 1, 1931, balance sheet had been received; for that balance sheet contained no detailed figures, and a number of the larger items were plainly open to serious question. The Harvey letter to Levin of January 14, 1931, asking for explanations, indicated deep concern, and yet the explanations requested were never given. Then came the request that the notes be paid off as they matured, and that the deposit balances be built up to the customary 20 per cent. figure; and, when these requests were ignored, renewals of the notes were cut down from three months to one month.

The deposit balances continued to dwindle until, on June 23, 1931, after a note for $1,250 had been paid, the account showed only $84.92 to the credit of the company; and so on June 25, 1931, Harvey wrote Levin insisting that the notes thereafter maturing be paid in full. In spite of this peremptory demand, the notes falling due in July and August were, however, renewed for short periods, with only a payment of $500 on July 27, 1931. In September, the entire Levin file was sent to the executive department after the loans had been criticized by the bank examiners; and the analysis of the figures made by Fisher in his memorandum of September 26, 1931, leaves no room for doubt that the bank at that time was not only doubtful on the figures shown on the balance sheet, but considered its own position extremely precarious; and so, on September 28, 1931, Harvey, at the direction of the executive department, again requested detailed information of the same general character as asked for by Harvey's previous letter of January 14, 1931. Can it be doubted that, if this information had been obtained in the early part of 1931, the true condition of the company would have been readily apparent? Certainly, if a proper investigation of the affairs of the company had been made then, the principal items appearing on the balance sheet as assets would have been shown to have had little real substance.

The note of $4,500 falling due on September 28, 1931, was not renewed, and went to protest; but on that day a check for $1,500 was deposited; and on the following day the account was charged with $1,500, and that amount applied on the note. Levin and Joseph Rubin interviewed Danmeyer and Bucklin of the executive department on September 30, 1931, and Danmeyer's memorandum shows that the bank was no longer interested in figures or explanations, but would require immediate payment of the indebtedness. The $3,000 payment on October 6, 1931, was made at a time when the balance in the account was $54.80; and I am satisfied that Harvey knew that this money came from one of the Rubins. Then, on October 16, 1931, the daily payments of $100 commenced, and these continued until December 10, 1931, when the indebtedness was completely liquidated.

Levin testified that the Levin Company had for a number of years borrowed from a finance company on assigned accounts, and that he had so advised Harvey. Harvey denied, however, that Levin had ever told him that loans were being made on the security of the accounts receivable, and I see no reason to doubt the accuracy of this testimony. I think, though, that the bank's own records are sufficient to charge the bank with the duty of inquiring; and, if a proper inquiry had been made, the preferential nature of the transfers would have appeared.

The defendants Nathan Levin and Jacob Rubin were indorsers on the notes held by the bank; and the payments made to the bank on September 29, 1931, and subsequent dates, were preferential as to them. In re Schleicher (C. C. A.) 62 F.(2d) 503. Jacob Rubin was a stockholder of the Levin Company, and not only indorsed every note given to the bank, but was represented by his son, Herman H. Rubin, during the negotiations with Harvey and the executive department in September, 1931. Furthermore, Jacob Rubin loaned money to the Levin Company on assigned accounts during 1931, and received as compensation thirty-nine payments of $37.50 each, covering the period from January 3, 1931, to November 28, 1931. I think, therefore, that both Nathan Levin and Jacob Rubin are chargeable with knowledge of the condition of the company.

There may be a decree against all three defendants for $9,000, less the sum of $64.16 appearing to the credit of the account at the time of the bankruptcy, or $8,935.84, with interest and costs.

### Supplemental Memorandum.

I can see no good reason why the defendant bank should not be permitted to recover over against the defendants Rubin and Levin on its cross-claim on payment of the plaintiff's judgment. The suit was framed and tried in equity without objection, and the ordinary equity rules are applicable. The defendants Rubin and Levin were indorsers on the notes held by the bank, and have been declared liable to the plaintiff on the ground that the payments to the bank were preferential as to them. It seems clear, therefore, that on the setting aside of the transfers to the bank the liability of the indorsers on the notes should be reinstated. I am accordingly directing judgment on the cross-bill in favor of the bank, conditioned on payment to the plaintiff; and the proposed decree submitted on behalf of the bank has been signed.